MORTON S. GOLDFINE AND ADRIENNE M. GOLDFINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13178–78.     Filed May 9, 1983.

*Stephen M. Margolin, Richard E. Brandwein,* and *Neil S. Pinzur,* for the petitioners.

*Allan E. Lang,* for the respondent.

PARKER, *Judge*: Respondent determined deficiencies in petitioners' 1972 and 1973 Federal income taxes in the respective amounts of $41,853.64 and $46,811.85. After concessions by both parties, the sole issue is whether the principal purpose of allocations in a joint venture agreement between petitioners and Blackard Construction Co. was the avoidance or evasion of taxes within the meaning of section 704(b).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners are husband and wife who resided in Peoria, Ill., when they filed their petition in this case. Petitioners timely filed joint Federal income tax returns for the taxable years 1972 and 1973. Petitioner Morton S. Goldfine (Goldfine) is an attorney practicing in Peoria, Ill. His practice as a personal injury lawyer is very successful, and during the years before the Court, he earned $100,000 to $150,000 a year.

Blackard Construction Co., an Illinois corporation, is in the housing construction business. Richard D. Blackard (Richard) is the president and sole shareholder of Blackard Construction Co. (Blackard). In 1969, Blackard purchased 112 acres of farmland in Decatur, Ill., to build single-family and multiunit residences. In 1970, Blackard began construction of the Yorkshire Apartments (Yorkshire) on this land. To finance the acquisition and development of the land and the construction of the apartment complex, Blackard incurred substantial debts. During Yorkshire's construction period, Blackard encountered serious cash flow problems. Richard believed that Blackard would not be able to complete Yorkshire without the influx of additional funds, which Blackard could not raise through its own resources. In the latter part of 1970, Blackard began searching for an outside investor who would invest approximately $100,000 in exchange for a partnership interest, but the corporation wanted to retain all of the cash flow from the project to service its outstanding debts. Richard

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.

negotiated with several potential investors on that basis, but was unsuccessful in interesting any investor in such an arrangement.

Around December of 1970, Richard and Goldfine were introduced to each other by a mutual acquaintance and began to discuss a potential partnership in Yorkshire. Blackard and Goldfine bargained extensively over the next several months. Finally, after being shown a depreciation projection prepared by Blackard's accountant, Goldfine agreed to an arrangement whereby Blackard would receive all of the cash flow, and he (Goldfine) would receive all of the depreciation deductions. Goldfine then drafted the joint venture agreement incorporating that arrangement.

On July 31, 1971, Blackard and Goldfine[2] entered into a joint venture agreement under the trade name of Black-Gold Co. (Black-Gold). In general, the agreement provided: (1) That the joint venture would continue until January 1, 1982; (2) that Blackard would contribute Yorkshire to the joint venture, subject to the mortgage debt, with Blackard's capital contribution deemed equivalent to its equity in Yorkshire, and valued in the agreement at $100,000; and (3) that Goldfine would contribute $100,000 in cash and assume personal liability upon the Yorkshire mortgage debt. The agreement also expressly provided:

6. * * * For the purpose of the joint venture and tax accounting, except as otherwise specified, depreciation shall be allocated to [Goldfine] and profit computed without depreciation shall be allocated to [Blackard]. Loss, if any, without computing depreciation shall be divided equally.

7. As mentioned in Paragraph Six (6) herein, all profits shall be allocated to [Blackard] and all depreciation shall be allocated to [Goldfine]. However, if the parties hereto chose [sic] to extend by mutual agreement this joint venture subsequent to January 1, 1982, then at that time and thereafter any remaining depreciation shall be divided equally between the parties, as well

---

[2]The joint venture agreement lists petitioners Morton S. Goldfine (Goldfine) and Adrienne M. Goldfine (Adrienne), "as joint tenants and not as tenants in common," collectively as the "Party of the Second Part." However, Adrienne did not endorse the five promissory notes to the bank, as the agreement required of the party of the second part. Goldfine testified that rather than becoming personally liable on the promissory notes, Adrienne quitclaimed her interest in the joint venture to him. Since Adrienne signed joint returns with Goldfine for the years in question, she is statutorily liable for any resulting deficiency, regardless of whether she in fact possessed an interest in the joint venture. Sec. 6013(d)(3). Accordingly, we shall treat the joint venture as between Blackard and Goldfine, alone, but we make no finding as to whether Adrienne in fact had an interest in the venture.

as the profit would be divided equally between the parties. This item of profit refers to rental income only. Upon sale of the joint venture assets, the gain shall be divided equally between the parties hereto, meaning sales price less mortgage balance due, taxes, and costs of the sale and then equally sharing the net proceeds of the sale.

  *   *   *   *   *   *   *

13. In the event of the termination of this joint venture * * * , then the surviving party shall either purchase the deceased's share * * * or the joint venture assets shall be sold * * * . However, the net proceeds to be received by the respective parties or the estate of a deceased party, shall be computed by taking the sales or agreed appraised price, less the mortgage indebtedness and taxes and the net proceeds to be divided equally upon a sale, or if a buy out, then the surviving party to pay his fifty (50) percent share.

Pursuant to the agreement, Goldfine executed and became jointly liable with Blackard on five promissory notes secured by the Yorkshire apartment complex, totaling $936,000, and payable to First Federal Savings & Loan Association of Peoria, Ill. Richard co-signed one of the promissory notes in the amount of $217,500 but otherwise refused to guarantee, personally, his corporation's debt.

Goldfine was aware of the tax benefits resulting from the special depreciation allocation and would not have entered into the joint venture agreement without the tax benefits resulting from it.

Pursuant to the joint venture agreement, Goldfine and Blackard have been allocated the following amounts of "depreciation losses" and "net income," respectively, from Black-Gold:

| Year (Black-Gold) | Goldfine "depreciation losses" | Blackard "net income" |
|---|---|---|
| 1971 | $47,851 | $4,923 |
| 1972 | 104,613 | 22,150 |
| 1973 | 95,335 | 11,881 |
| 1974 | 65,035 | 15,163 |
| 1975 | 56,538 | 43,087 |
| 1976 | 41,158 | 38,779 |
| 1977 | 38,629 | 28,763 |
| 1978 | 33,903 | 45,089 |
| 1979 | 33,903 | 45,382 |
| Totals | 516,965 | 255,217 |

Black-Gold's Form 1065 information returns for each of the years reported the partners' allocated distributive shares in

accordance with the above allocations, which for the years here in question were as follows:

| Year | Blackard | Goldfine |
|------|----------|----------|
| 1972 ..................... | $22,150 | ($104,613) |
| 1973 ..................... | 11,881 | (95,335) |

Blackard's Form 1120 corporate income tax returns reported Blackard's "income" from Black-Gold and overall taxable income or loss as follows:

| FYE Sept. 30— | "Distributive Share"[3] Black-Gold | Overall taxable income (loss) |
|---------------|-----------------------------------|-------------------------------|
| 1971 ............................. | 0 | $9,338 |
| 1972 ............................. | $4,923 | (21,177) |
| 1973 ......................... | 22,150 | (686) |

Goldfine's Form 1040 joint income tax returns for the years in question reported Goldfine's "losses" from Black-Gold and overall income as follows:

| Year | Adjusted gross income (AGI) without Black-Gold "Loss" | "Distributive Shares" Black-Gold | AGI shown on Form 1040 | Taxable income |
|------|--------------------------------------------------------|----------------------------------|------------------------|----------------|
| 1972 | $147,367.26 | ($104,613) | $42,754.26 | $21,952.35 |
| 1973 | 149,021.50 | (95,335) | 53,686.50 | 25,489.85 |

In the period from 1971 through 1979, Blackard received the following amounts from Black-Gold:

| Year (Black-Gold) | Management fees | Withdrawals | Totals |
|-------------------|-----------------|-------------|--------|
| 1971 | $4,204 | $3,042 | $7,246 |
| 1972 | 11,718 | [4]6,502 | 18,220 |
| 1973 | 16,350 | [5]8,092 | 24,442 |
| 1974 | 19,728 | [5]3,952 | 23,680 |
| 1975 | 16,117 | 30,003 | 46,120 |
| 1976 | 0 | 37,663 | 37,663 |
| 1977 | 0 | 15,879 | 15,879 |
| 1978 | 0 | [5]46,878 | 46,878 |
| 1979 | 0 | 35,700 | 35,700 |
| Totals | 68,117 | 187,711 | 255,828 |

[3]Black-Gold used a calendar year while Blackard used a fiscal year ending Sept. 30. Thus, Blackard included its "distributive share" from Black-Gold's calendar year in its income for its taxable year ending the following Sept. 30. See sec. 706(a).

[4]This figure is reported on Black-Gold's 1973 return as Blackard's withdrawals, and accords with the total figures for 1972 as shown on the parties' summation of cash distributions to Blackard. We believe this to be the correct amount, rather than the figure of $6,605 shown on the parties' summation.

[5]Blackard made additional contributions to Black-Gold's capital during these years in the respective amounts of $4,030, $1,869, and $6,200. The figures shown as Blackard's

The above amounts represent distributions to Blackard of management fees and Black-Gold's operating cash flow. Black-Gold also distributed to Blackard and Goldfine the proceeds of refinanced loans during two of the years and those proceeds were split 50-50 as follows:

| Year (Black-Gold) | Blackard | Goldfine |
|---|---|---|
| 1973 | $40,328 | $40,328 |
| 1976 | 67,736 | 67,736 |

Other than these proceeds of the refinanced loans, Goldfine received no cash distributions from Black-Gold for the period 1971-79.

All of the allocations, withdrawals, and distributions discussed above are reflected in the parties' capital accounts as reported on Black-Gold's Form 1065 information returns for the years 1971-79. The yearend capital account balances for Goldfine and Blackard for the years 1971-79 were as follows:

| Date | Goldfine | Blackard |
|---|---|---|
| Beginning of partnership | $100,000 | $100,000 |
| 12/31/71 | 52,149 | 101,881 |
| 12/31/72 | (52,464) | 134,018 |
| 12/31/73 | (188,127) | 102,409 |
| 12/31/74 | (253,162) | 115,489 |
| 12/31/75 | (309,700) | 128,573 |
| 12/31/76 | (418,594) | 61,953 |
| 12/31/77 | (457,223) | 74,837 |
| 12/31/78 | (491,126) | 79,248 |
| 12/31/79 | (525,029) | 88,930 |

In his notice of deficiency for the years 1972 and 1973, respondent determined that the allocations in the Black-Gold joint venture agreement were made for the principal purpose of avoiding or evading income taxes, and redetermined petitioners' income by allowing them 50 percent of the net loss, including depreciation, from the Black-Gold joint venture.

---

withdrawals for these 3 years are gross withdrawals, not net figures after taking into account Blackard's additional contributions during these years.

OPINION

Blackard and Goldfine entered into a joint venture to own and operate an apartment complex. Each contributed one-half of the initial capital. Under the terms of their agreement, each was to share equally the proceeds of the sale of the joint venture assets, and any net proceeds on liquidation. Each actually shared equally certain cash distributions representing proceeds from refinanced loans. Each was equally liable for cash losses (i.e., any losses computed without depreciation). However, the joint venture agreement allocated to Goldfine all of the depreciation deductions, and allocated to Blackard all of the net income computed without depreciation. We must decide whether the principal purpose of these allocations was the avoidance or evasion of income taxes.

Partners[6] must report as income their distributive shares of partnership income. Sec. 702(a).[7] Section 704 grants partners great latitude in determining themselves by their partnership

---

[6]For purposes of Federal income taxation, partners include joint venturers and partnerships include joint ventures. Sec. 761(a) and (b). Moreover, under the State law (Illinois) applicable to this case, joint ventures are generally governed by the same legal principles that govern partnerships. *Smith v. Metropolitan Sanitary District of Greater Chicago*, 77 Ill. 2d 313, 396 N.E.2d 524, 527 (1979); *Prassas v. Nicholas W. Prassas & Co.*, 94 Ill. App. 3d 311, 418 N.E.2d 904, 907–908 (1981).

[7]As in effect during the taxable years in question, sec. 702(a) provided:

SEC. 702(a). GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

(1) gains and losses from sales or exchanges of capital assets held for not more than 6 months,

(2) gains and losses from sales or exchanges of capital assets held for more than 6 months,

(3) gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),

(4) charitable contributions (as defined in section 170(c)),

(5) dividends with respect to which there is provided an exclusion under section 116, or a deduction under part VIII of subchapter B,

(6) taxes, described in section 901, paid or accrued to foreign countries and to possessions of the United States,

(7) partially tax-exempt interest on obligations of the United States or on obligations of instrumentalities of the United States as described in section 35 or section 242 (but, if the partnership elects to amortize the premiums on bonds as provided in section 171, the amount received on such obligations shall be reduced by the reduction provided under section 171(a)(3)),

(8) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary or his delegate, and

(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

agreement what their distributive shares will be. Normally, a partner's distributive share of income, gain, loss, deduction, or credit will be determined by the terms of the partnership agreement. Sec. 704(a).[8] However, section 704(b) imposes certain limitations upon the partners' right to fix their distributive shares.[9] For pre-1976 taxable years, those limitations were phrased in terms of a tax-avoidance test, namely, that allocations of an "item" of income, gain, loss, deduction, or credit would be disregarded if the principal purpose of the allocation was avoidance or evasion of tax (sec. 704(b)(2)). That tax-avoidance test did not differ significantly from the "substantial economic effect" test that was adopted in 1976. See note 9. And both before and after 1976, an allocation of bottom line income or loss (sec. 702(a)(9) before 1976) must likewise have economic substance in the sense that it reflects the *actual* division of income or loss among the partners when viewed from the standpoint of economic, rather than tax, consequences. See *Holladay v. Commissioner*, 72 T.C. 571 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); *Boynton v. Commissioner*, 72 T.C. 1147 (1979), affd. 649 F.2d 1168 (5th Cir. 1981); *Kresser v. Commissioner*, 54 T.C. 1621 (1970).

In a pre-1976 situation, as here, under the express language of section 704(b) "a partner's distributive share of any item of

---

[8]As in effect during the taxable years in question, sec. 704(a) provided as follows:

SEC. 704(a). EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

[9]As in effect during the taxable years in question, sec. 704(b) provided as follows:

SEC. 704(b). DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

Sec. 704 was amended by sec. 213(d), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1548, and sec. 704(b), as amended, replaced the tax-avoidance or-evasion test with a "substantial economic effect" test and expressly included bottom line allocations within its purview. Sec. 704(b), as thus amended, seems to adopt the judicial gloss that had previously been applied to the pre-1976 statutory provisions. See W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.02, at 10–10 to 10–11 (1977), and 2 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, secs. 82.02, 82.03, at 82–3 to 82–6 (3d ed. 1982).

income is determined in accordance with his distributive share of taxable income or loss unless the partnership agreement provides special allocations, in which case the allocations are effective for Federal tax purposes unless the principal purpose of the allocation is the avoidance or evasion of income tax." *Holladay v. Commissioner*, 72 T.C. at 586. See *Orrisch v. Commissioner*, 55 T.C. 395, 399–401 (1970), affd. per curiam in an unreported opinion (9th Cir. 1973, 31 AFTR 2d 73–1069). If the special allocation is disregarded, the partners' shares of the item are determined in accordance with the ratio by which the partners, themselves, divide the general profits and losses of the partnership. Sec. 704(b); sec. 1.704–1(b)(2), Income Tax Regs; *Orrisch v. Commissioner*, 55 T.C. at 400.

Section 1.704–1(b)(2), Income Tax Regs., further provides:

In determining whether the principal purpose of any provision in the partnership agreement for a special allocation is the avoidance or evasion of Federal income tax, the provision must be considered in relation to all the surrounding facts and circumstances. Among the relevant circumstances are the following: Whether the partnership or a partner individually has a business purpose for the allocation; whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences; whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonabl[y] be estimated; the duration of the allocation; and the overall tax consequences of the allocation.

The most important of these tests, and the sole test after 1976 (see note 9), is "substantial economic effect," by which we look to see that the partner to whom the item is specially allocated for tax purposes also bears the economic burdens and benefits of that specially allocated item. *Allison v. United States*, 701 F.2d 933 (Fed. Cir. 1983); *Hamilton v. United States*, 231 Ct. Cl. \_\_\_, 687 F.2d 408, 414, 417 (1982); *Harris v. Commissioner*, 61 T.C. 770, 786 (1974); *Orrisch v. Commissioner*, 55 T.C. at 403.[10] See also W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.02, at 10–10 to 10–11 (1977); 2 A. Willis, J. Pennell & P. Postlewaite, Partner-

---

[10]See also *Magaziner v. Commissioner*, T.C. Memo. 1978–205.

ship Taxation, sec. 82.02, at 82–3 to 82–5 (3d ed. 1982). If a partner's allocation of an item of income or deduction is reflected in his capital account and if the liquidation proceeds of the entity are distributed in accordance with the capital account balances, the allocation has substantial economic effect. *Allison v. United States, supra.*[11] Moreover, where a partner's capital account registers a deficit, he must have the obligation upon liquidation to restore that deficit. Absent such an obligation, the other partner or partners would have to bear part of the economic cost of the special allocations that resulted in the deficit capital account. *Harris v. Commissioner, supra* at 786. *Orrisch v. Commissioner, supra* at 403-404. See also W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, pars. 10.02[2], 10.02[2][b], at 10–17 to 10–18, 10–21 to 10–23 (1977); 2 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, secs. 86.03, 86.05, at 86–3 to 86–6, 86–8 to 86–9 (3d ed. 1982). We will apply the above "capital accounts analysis" to the facts of the instant case.

It is apparent that the allocation of depreciation to Goldfine lacks substantial economic effect. While the special allocation is reflected in Goldfine's capital account, the partnership agreement does not provide that the partners are liable to restore deficits in their capital accounts. Petitioners argue that the Illinois Uniform Partnership Act[12] imposes such an

---

[11]See also *Magaziner v. Commissioner, supra.*

[12]Sec. 18(a) of the Illinois Uniform Partnership Act, Ill. Ann. Stat. ch. 106½, sec. 18(a) (Smith-Hurd 1952), provides:

"The rights and duties of the partners in relation to the partnership shall be determined, *subject to any agreement between them,* by the following rules:

"(a) Each partner shall be repaid his contribution, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; *and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.*

"[Emphasis supplied.]"

Sec. 40 of the Illinois Uniform Partnership Act, Ill. Ann. Stat. ch. 106½, sec. 40 (Smith-Hurd 1952), provides in pertinent part:

In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

(a) The assets of the partnership are:

I. The partnership property,

II. The contributions of the partners necessary for the payment of all the liabilities specified in clause (b) of this paragraph.

(b) The liabilities of the partnership shall rank in order of payment, as follows:

obligation upon the partners. We do not believe that the Uniform Partnership Act makes any express provision for such restoration,[13] but we need not address petitioners' argument. Even assuming that Goldfine must restore his deficit, it is clear from the partnership agreement that the assets on dissolution are not to be distributed on the basis of the balances in the partners' capital accounts. Rather, upon liquidation, the partnership agreement plainly calls for an equal division of the net proceeds. The agreement, drafted by Goldfine himself, expressly provided that upon sale of the assets "the gain shall be divided equally between the parties hereto, meaning sales price less mortgage balance due, taxes, and costs of the sale and then equally sharing the net proceeds of the sale." Similarly, the agreement expressly provided for equal division of the net proceeds in the event of termination, defining net proceeds as "the sales or agreed appraised price, less the mortgage indebtedness and taxes." Thus, under the "capital accounts analysis," Goldfine does not bear the economic burden of the depreciation deductions allocated to him.

However, petitioners argue that the allocation nonetheless has substantial economic effect because in fact Goldfine would actually have borne any losses that might have resulted.

---

I. Those owing to creditors other than partners,

II. Those owing to partners other than for capital and profits.

III. Those owing to partners in respect of capital,

IV. Those owing to partners in respect of profits.

(c) The assets shall be applied in the order of their declaration in clause (a) of this paragraph to the satisfaction of the liabilities.

(d) The partners shall contribute, as provided by Section 18(a) the amount necessary to satisfy the liabilities; but if any, but not all, of the partners are insolvent, or, not being subject to process, refuse to contribute, the other partners shall contribute their share of the liabilities, and, in the relative proportions in which they share the profits, the additional amount necessary to pay the liabilities.

\* \* \* \* \* \* \*

(f) Any partner or his legal representative shall have the right to enforce the contributions specified in clause (d) of this paragraph, to the extent of the amount which he has paid in excess of his share of the liability.

These provisions are identical to the Uniform Partnership Act drafted by the National Conference of Commissioners on Uniform State Laws. Uniform Partnership Act, secs. 18(a), 40, 6 U.L.A. 213, 468–469 (1969).

[13]See, however, *Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672–675 (Tex. 1976), construing similar provisions of the Texas Uniform Partnership Act, which required a general partner to restore a deficit balance in her capital account resulting from the allocation to her of partnership depreciation deductions.

Petitioners argue that since Blackard was insolvent at the time of the agreement, Goldfine's guarantee of Blackard's indebtedness upon Yorkshire made certain that Goldfine, alone, would actually pay any loss. We disagree. The record is inadequate to support a finding that Blackard was in fact insolvent at the time the parties executed their agreement. Moreover, petitioners' argument ignores Richard's guarantee of one of the five promissory notes. We conclude that the special allocation of depreciation to Goldfine lacked substantial economic effect.

Addressing some of the other factors listed in section 1.704-1(b)(2), Income Tax Regs., petitioners argue that a business purpose for the allocation is established because the allocations in the agreement were bargained for at arm's length. We disagree. Bargaining for tax benefits does not establish a business purpose. The business purpose test enunciated in the regulation requires business motivations or business validity apart from, and independent of, tax considerations. *Allison v. United States, supra; Orrisch v. Commissioner*, 55 T.C. at 401. Moreover, the depreciation deductions over the 10-year period were not only subject to reasonable estimation in this case, but were in fact actually projected by Blackard's accountant before the parties entered into their partnership agreement. This factor indicates a tax-avoidance motive. Petitioners also argue that the 10-year duration of the special allocation is a factor showing lack of a tax-avoidance motive. This factor may in some situations weigh somewhat against a finding of a tax-avoidance motive, but that factor, alone, is not sufficient here.

In light of the lack of substantial economic effect, the lack of business purpose or business validity apart from the tax consequences, the fact of Goldfine's actual knowledge of the amounts of depreciation deductions that would be allocated to him over the 10-year period, and the fact of Goldfine's express admission that without the allocation of depreciation deductions he would not have entered into the agreement, we conclude that the principal purpose of the special allocation of depreciation deductions to Goldfine was the avoidance or evasion of income taxes.

The joint venture agreement also allocated to Blackard all of Black-Gold's net income computed without depreciation. Petitioners contend that the allocation of net income without

depreciation to Blackard is a "bottom line" allocation of the partnership's overall taxable income or loss, under section 702(a)(9), and thus not a special allocation and not subject to the tax-avoidance test of section 704(b). See *Hamilton v. United States*, 687 F.2d at 413–414; *Boynton v. Commissioner*, 649 F.2d at 1172–1173; *Holladay v. Commissioner*, 72 T.C. at 586–587; *Kresser v. Commissioner*, 54 T.C. at 1631 n. 5 (1970). Whatever the distinctions under pre-1976 law between "item" allocations and "bottom line" allocations, a discussion at long last laid to rest by the Tax Reform Act of 1976,[14] we think such distinctions have had little practical effect on the resolution of cases and under the facts of this case will have little effect. However, we will consider petitioners' arguments.

Section 1.704–1(b)(1), Income Tax Regs., provides:

If the partnership agreement makes no specific provision for the manner of sharing one or more items or classes of items, a partner's distributive share of such items shall be determined in accordance with the provisions of the partnership agreement for the division of the general profits or losses (that is, the taxable income or loss of the partnership as described in section 702(a)(9)). In applying this rule, the manner in which the net profit or loss (computed after excluding any item subject to a recognized special allocation) is actually credited on the partnership books to the accounts of the partners will generally determine each partner's share of taxable income or loss as described in section 702(a)(9).

Thus, under the regulation, bottom line allocations are those of overall partnership taxable income or loss "computed after excluding any items subject to a *recognized* special allocation." (Emphasis added.) If we had sustained the validity of the special allocation of depreciation to Goldfine, the allocation to Blackard would have been a bottom line allocation, because it would have been an allocation of overall taxable income or loss of the partnership computed after the exclusion of "a recognized special allocation." Since we hold the depreciation allocation is not a *valid* special allocation, the allocation to Blackard is not a "bottom line" allocation because it does not

[14]As noted in note 9 *supra*, the Tax Reform Act of 1976, sec. 213(d), Pub. L. 94–455, 90 Stat. 1520, amended sec. 704(b). This amendment provided that the test under sec. 704(b) for validity of partnership allocations was "substantial economic effect," and made clear that this test also applied to bottom line allocations. H. Rept. 94–658 (1976), 1976–3 C.B. (Vol. 2) 695, 818; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3), 49, 137; S. Rept. 94–1236 (Conf.) (1976), 1976–3 C.B. (Vol. 3) 807, 825–826.

include an item of deduction (depreciation) that goes into computing overall partnership taxable income or loss. Therefore, we conclude the allocation to Blackard is a special allocation of each of the items of partnership income and deduction, except depreciation.

Accordingly, we are free to apply the factors in section 1.704–1(b), Income Tax Regs., quoted above, to determine whether the special allocations to Blackard were made principally for tax-avoidance purposes. These allocations were made subject to normal business risks and their amounts were not subject to reasonable estimation. The allocations to Blackard of net cash flow, and net income without depreciation, were dependent solely upon Black-Gold's success. The fluctuations in net income without depreciation reported by Blackard, and cash distributions (including management fees) to Blackard between 1971 and 1979, demonstrate that these amounts could not be reasonably estimated at the outset of the venture. Blackard apparently wanted the positive cash flow to service its other debts, and this factor could perhaps indicate a business purpose on the part of one of the partners, independent of that partner's tax concerns. However, these are only three of the several factors we must consider in determining whether the principal purpose of the allocations was tax avoidance.

As indicated above, however, the crucial factor is whether allocations have "substantial economic effect." It is here that the allocations to Blackard must fail. Although the allocations and distributions to Blackard are reflected in its capital account, the partnership agreement expressly provides that the net proceeds on liquidation are to be divided equally between Blackard and Goldfine, not on the basis of their capital account balances. During Black-Gold's 1972 tax year, Blackard withdrew funds representing Black-Gold's cash flow in the amount of $6,502, while it was charged with $22,150 in net income. During Black-Gold's 1973 tax year, Blackard withdrew $8,092 representing Black-Gold's cash flow while being charged with net income of $11,881.[15] Thus, in both years, the amount of Black-Gold's cash flow distributed to

---

[15]During these years, Blackard also received cash distributions of management fees. However, these fees appeared to have been reported separately on Blackard's corporate

Blackard did not equal the total amount of income that was charged to and reported by Blackard. Equal distributions to Blackard and Goldfine of net liquidation proceeds would result in Goldfine's receiving profits charged and taxed to Blackard. Likewise, after reallocating back to Blackard its distributive share of the partnership depreciation deductions improperly allocated to Goldfine, an equal distribution of the net liquidation proceeds to Blackard and Goldfine might not restore to Blackard all of the items charged to its capital account.[16] In either case, the special allocations do not affect the partners' actual division of profits and losses, and therefore lack substantial economic effect.

Finally, the overall tax consequences to Blackard and Goldfine also indicate a tax-avoidance purpose. Blackard was allocated "net income" upon which Blackard paid no taxes because it was offset against Blackard's net operating losses from its other operations. Goldfine reported large depreciation losses which offset large portions of his income from his law practice otherwise subject to tax at a 50-percent marginal rate. Thus, the actual tax effect of the allocations, if permitted, would be to minimize the parties' overall tax burdens. After weighing all the facts, we conclude that the principal purpose of the allocations to Blackard, as with the special allocation to Goldfine, was the avoidance or evasion of income taxes.

Alternatively, even if we view the allocation to Blackard as a bottom line allocation of Black-Gold's overall profits and losses, it is still ineffective for tax purposes. Whether or not bottom line allocations are directly subject to the tax-avoidance test of section 704(b), bottom line allocations nonetheless must be bona fide, truly reflecting the economic substance of the partners' rights and obligations. "[F]or allocations of partnership bottom line income or loss to be bona fide for Federal tax purposes, the allocations must accurately reflect

---

income tax returns, and were reported as deductions on Black-Gold's partnership information returns.

[16]In fact, the only way by which an equal distribution of net liquidation proceeds to Goldfine and Blackard could possibly have substantial economic effect (i.e., be on the basis of capital account balances) would be if their capital account balances were equal. Moreover, the only way in which the capital account balances could be equal would be if total distributions of cash flow to Blackard in both years exactly equaled the "net income" computed without depreciation charged to its capital account. This, of course, was not the case, and in any event would be a rather remarkable coincidence.

the economic basis upon which the partners have agreed to share the profits and losses." *Holladay v. Commissioner*, 72 T.C. at 587; *Boynton v. Commissioner*, 649 F.2d at 1172–1174; *Kresser v. Commissioner*, 54 T.C. at 1630–1631.[17] As discussed above, the allocations to Blackard have no real effect on the actual manner in which the partners divided Black-Gold's profits and losses. Accordingly, we conclude that the allocation to Blackard was not bona fide because it did not affect the actual economic rights and obligations of the partners and did not reflect the *actual* division of income or loss between the partners when viewed from the standpoint of economic, rather than tax, consequences.

Finally, having invalidated for tax purposes the special allocation of depreciation to petitioner and the allocations to Blackard, we should consider the proper distributive share upon which Goldfine is taxable. Each partner contributed an equal amount of capital and, under the agreement, each was to share equally in net proceeds from the sale of partnership assets and in the net proceeds from liquidation of the partnership. Moreover, each shared equally any "real" cash losses (i.e., losses computed without depreciation). In his notice of deficiency, respondent determined that Goldfine's distributive share of each partnership item was 50 percent, and the record is insufficient to establish that Goldfine's distributive share is other than 50 percent. However, the partnership agreement entitled Blackard to all of the cash flow distributions and Blackard actually received those cash distributions. And it is not clear whether or not respondent took this factor into account in determining Goldfine's distributive share.[18] Cf.

---

[17]See also *Sellers v. Commissioner*, T.C. Memo. 1977–70, affd. on another issue 592 F.2d 227 (4th Cir. 1979), and *Martin v. Commissioner*, T.C. Memo. 1982–226.

[18]The treatment of cash flow special allocations is unsettled, and we express no view on the matter. We have found no cases directly dealing with the question, and the commentators are divided. Willis suggests that distributions of cash flow, even as a special allocation, should be governed by sec. 731, so that such cash flow distributions are taxable only to the extent they exceed the distributee partner's basis. 2 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, sec. 82.16, at 82–40 to 82.43 (3d ed. 1982). Others suggest that where the cash flow allocations are not reflected in partner capital accounts upon which liquidation proceeds are to be distributed, the cash flow distributions may be—(1) taxable to the distributee partner under sec. 707(a) or 707(c); (2) a special allocation of gross receipts taxable as part of the distributive share under sec. 702 (with a commensurate reduction in basis under sec. 731 for the cash distribution); or (3) taxable as a "capital shift from the other partners." W. McKee, W. Nelson & R. Whitmire, Federal Taxation of

2 A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, sec. 81.04, at 81–5 to 81–7 (3d ed. 1982); S. Rept. 938 (1976), 1976–3 C.B. (Vol. 3) 49, 138. See also Proposed Regs. 1.704-1(b)(3)(iii), 1983–14 I.R.B. 25, 29. The parties may wish to consider this matter and may be able to attend to it in the computation under Rule 155 if that can be done without the necessity of reopening the record.

To reflect the parties' concessions and the foregoing,

*Decision will be entered under Rule 155.*

---

Partnerships and Partners, pars. 10.07[2], 10.07[3], at 10–51 to 10–53; Solomon, "Current Planning for Partnership Start-up, Including Special Allocations, Retroactive Allocations and Guaranteed Payments," 37 N.Y.U. Tax. Inst., sec. 13.03[4], at 13–37 to 13–38 (1979).

Blackard is not a party to this litigation, but the tax treatment to it of the cash flow allocation and distributions would logically and consistently affect the manner in which those distributions should be considered in determining Goldfine's distributive share. If the cash flow distributions are treated solely under sec. 731, and thus not independently taxable, determining Goldfine's distributive share at 50 percent may result in unequal treatment for so-called equal partners—Blackard and Goldfine will have shared equally (1) bottom line taxable income and loss, (2) loan refinancing distributions, (3) asset-sale distributions, and (4) liquidation distributions, but Blackard will have received all of the cash flow distributions while Goldfine will have received nothing in return. One way to equalize their positions might be to give Goldfine an additional amount of Black-Gold's bottom line losses in an amount equal to Blackard's cash flow distributions, and then to divide the remaining taxable loss equally between Blackard and Goldfine. Thus, their hypothetical capital accounts would be reduced by equal amounts, maintaining their equal partnership. On the other hand, if the cash flow distributions are independently taxable to Blackard, as McKee and Solomon suggest, then there is no need to give Goldfine an additional amount of Black-Gold's bottom line loss since a determination of 50-percent distributive shares will maintain equality between the equal partners. The record does not indicate whether the cash flow distributions were taxed to Blackard independently of secs. 702 and 731. The record is singularly devoid of any information as to the tax treatment of Blackard.