JOSEPH M. HOGAN AND BARBARA J. HOGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hogan v. Commissioner
Docket Nos. 18980-85, 18970-87, 18971-87 [1]
United States Tax Court
T.C. Memo 1990-295; 1990 Tax Ct. Memo LEXIS 313; 59 T.C.M. (CCH) 870; T.C.M. (RIA) 90295; June 14, 1990, Filed *313 Decision will be entered under Rule 155 at docket No. 18980-85. Decisions will be entered for the respondent at docket Nos. 18970-87 and 18971-87. Albert R. Riviezzo and Michael C. McBratnie, for the petitioners. Ruth M. Williams, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent, in three separate notices of deficiency, determined deficiencies in and additions to tax to petitioners' Federal income taxes as follows: Addition to Tax
Docket Number
Year
Deficiency
Section 6661 [2]
18980-85
1982
$ 32,872
$ 3,287.20
18970-87
1981
11,954
--
18971-87
1983
6,506
-- Following concessions, [3] *314 the issues for decision are: (1) Whether the reported distributions of losses to Joseph M. Hogan as a partner in the Honey Hill Farm partnership are allocations that have no substantial economic effect within the meaning of section 704(b); and (2) whether petitioners are liable for the addition to tax pursuant to section 6661 for taxable year 1982. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Merion, Pennsylvania when they filed their petitions in these cases. Petitioners timely filed joint Federal tax returns for taxable years 1981, 1982, and 1983. During the years in issue, Joseph M. Hogan (Dr. Hogan) was one of three general partners of the Honey Hill Farm partnership. The *315 other general partners were Dr. Frederick A. DeClement and William A. Hogan (Mr. Hogan). The Honey Hill Farm partnership was formed in 1973, and was involved in breeding and showing quarter horses. During the years in issue, Honey Hill Farm experienced the following ordinary losses: Year Ended
Loss
12/31/81
$ 79,203
12/31/82
72,582
12/31/83
52,596
Petitioners, on their Federal income tax returns for the years in issue, deducted the following losses from Honey Hill Farm: Year Ended
Loss
12/31/81
$ 52,802
12/31/82
48,389
12/31/83
35,063
Petitioners' claimed losses constituted two-thirds of the total yearly partnership losses. Respondent, in his notices of deficiency, determined that petitioners were only entitled to deduct one-third of the partnership losses during each of the years in issue. At the beginning of 1981, Dr. Hogan's capital account balance was zero. Mr. Hogan's capital account balance at the beginning of 1981 was $ 15,349. Dr. DeClement became a partner in Honey Hill Farm during 1981. During the years in issue, the three partners made the following capital contributions to Honey Hill Farm: 1981
1982
1983
Dr. Joseph M. Hogan
[4] *316 $  50,000
$ 25,000
$ 16,000
Dr. Frederick A. DeClement
[5] 110,000
5,000
8,000
William A. Hogan
-- -- -- The year-end capital account balances of the partners for the years 1981 through 1983 were reported on Honey Hill Farm's Forms 1065 as follows: 1981
1982
1983
Dr. Joseph M. Hogan
$  2,198
($ 26,191)
($ 45,254)
Dr. Frederick A. DeClement
83,599
64,404 54,872 William A. Hogan
15,349
15,349 15,349 Dr. *317 Hogan's actual year-end capital account balances during 1981, 1982, and 1983, were ($ 2,802), ($ 31,191), and ($ 50,254) respectively. [6]
William Hogan and Joseph Hogan are brothers. Mr. Hogan was responsible for the daily operations of Honey Hill Farm. He spent a minimum of 28 hours a week feeding and caring for the horses, consulting with veterinarians, training the foals, and tending to administrative tasks. Although he did not receive a salary, Mr. Hogan estimated that his services on behalf of the partnership were worth between $ 15,000 and $ 20,000 a year. Mr. Hogan's one-third interest in the partnership was given to him in exchange for the services he provided. Prior to the years in issue, and before Dr. DeClement became a partner, Dr. Hogan and Mr. Hogan considered themselves equal partners in Honey Hill Farm. Dr. Frederick A. DeClement is a surgeon who has known Dr. Hogan for more than 20 years. During 1981 he contributed $ 110,000 to Honey Hill Farm. Dr. DeClement considered himself a one-third partner in the Honey Hill Farm partnership, but did not know if he was a general partner. Dr. DeClement considered his involvement in Honey Hill Farm a financial *318 investment. Dr. Hogan is a physician specializing in internal medicine and rheumatology. During each of the years in issue he reported earnings from his medical practice in excess of $ 100,000. Like Dr. DeClement, Dr. Hogan considered the partnership a financial investment. The Honey Hill Farm partnership did not have a formal written partnership agreement. The three partners had orally agreed to share profits equally and to allocate two-thirds of any losses to Dr. Hogan and one-third to Dr. DeClement. They generally considered themselves as each owning a one-third interest in the partnership. OPINION A partner must take into account his "distributive share" of each item of partnership income, gain, deduction, loss, and credit in determining his income tax. Sec. 702(a). Section 704(a) generally provides that a partner's distributive share shall be determined by the partnership agreement. [7] This general rule is limited, however, by section 704(b)(2), which provides that an allocation provision in the partnership agreement will be disregarded if the allocation lacks substantial economic effect. If the allocation in the partnership agreement is disregarded, a partner's distributive *319 share of the partnership's income, gain, loss, deduction or credit is determined in accordance with the partner's interest in the partnership, determined by taking into account all facts and circumstances. Sec. 704(b). [8] *320 Petitioners argue that section 704(b) only applies to "special allocations" and that the allocation of two-thirds of the partnership losses to Dr. Hogan is not a "special allocation" because he contributed two-thirds of the partnership's operating expenses. [9] *321 Respondent argues that section 704(b) applies to all partnership allocations. We agree with respondent. Section 704(b)(2) is not restricted by its terms to "special allocations." Instead, section 704(b)(2) states that any allocation under a partnership agreement that does not have substantial economic effect will be determined in accordance with the partner's interest in the partnership. Section 704(b), as amended by the Tax Reform Act of 1976, made it clear that the "substantial economic effect" test is applicable to all partnership allocations. H. Rept. 94-658 (1976), 1976-3 C.B. (Vol. 2) 695, 818; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 137; S. Rept. 94-1236 (Conf.) (1976), 1976-3 C.B. (Vol. 3) 807, 825-826; Goldfine v. Commissioner, 80 T.C. 843, 851, 855 & n.14 (1983). To determine whether an allocation has "substantial economic effect," it is necessary to determine whether the partner to whom the item is allocated for tax purposes also bears the economic burdens and benefits of that allocated item. Allison v. United States, 701 F.2d 933, 938 (Fed. Cir. 1983); Elrod v. Commissioner, 87 T.C. 1046, 1084 (1986); Goldfine v. Commissioner, supra at 851; Harris v. Commissioner, 61 T.C. 770, 786 (1974); Orrisch v. Commissioner, 55 T.C. 395, 403 (1970), affd. per curiam *322 by an unpublished opinion (9th Cir., Mar. 3, 1973). We have adopted a capital accounts analysis of substantial economic effect. Ogden v. Commissioner, 84 T.C. 871, 883-884 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986); Gershkowitz v. Commissioner , 88 T.C. 984, 1017-1019 (1987); Elrod v. Commissioner, supra at 1082-1086; Goldfine v. Commissioner, supra at 852. Under this analysis, if a partner's allocation of an item of income or deduction is reflected in his capital account and if the liquidation proceeds of the entity are distributed in accordance with the capital account balances, the allocation will be viewed as having substantial economic effect. Allison v. United States, supra at 938. Moreover, in situations where a partner's capital account registers a deficit attributable to a special allocation, that partner must have the obligation upon liquidation to restore that deficit. Absent such an obligation, the other partner or partners would have to bear part of the economic cost of the special allocation that resulted in the deficit capital account. Elrod v. Commissioner, supra at 1084; Ogden v. Commissioner, 84 T.C. at 884; Goldfine v. Commissioner, supra at 852; Harris v. Commissioner, supra at 786; *323 Orrisch v. Commissioner, 55 T.C. at 403-404. Petitioners bear the burden of proving that the allocation does not lack substantial economic effect. Ogden v. Commissioner , 84 T.C. at 884; Rule 142(a). Respondent does not dispute that the allocations of partnership losses were properly reflected in the partners' capital accounts during the years in issue. We have previously found that these losses resulted in a deficit in Dr. Hogan's capital account at the end of each of the years in issue. Therefore, to determine whether the allocations of losses to Dr. Hogan have substantial economic effect, we must determine: (1) Whether upon liquidation any partner with a deficit capital account balance would be obligated to restore that deficit and, if so, (2) whether upon liquidation the proceeds of the partnership would be distributed in accordance with the partners' capital account balances. Petitioners argue that the partnership agreement expressly provided that upon liquidation any partner with a deficit capital account balance would be obligated to restore that deficit. However, during their testimony, the three partners were unable to recall having specifically agreed upon what would occur *324 if a partner's interest was to be liquidated, if the partnership itself was liquidated, or what effect the death of a partner would have on the partnership. Mr. Hogan's testimony regarding the partnership agreement was vague. He understood that each partner held a one-third interest and that losses were allocated one-third to Dr. DeClement and two-thirds to Dr. Hogan. Beyond this, he provided no details of what else, if anything, was agreed upon. Dr. DeClement testified that the partners had agreed on how to allocate profits and losses, but had not discussed what would happen if a partner died, if the partnership liquidated, or if a partner decided to leave the partnership. Dr. DeClement was under the impression that if he died, his partnership interest would pass to his estate. Dr. Hogan also testified concerning his understanding of the partnership agreement. At trial, the following discussion transpired: Q. [MR. RIVIEZZO]: What was your understanding in the event a partner wanted to withdraw from the partnership? A. [DR. HOGAN]: We would -- we were one-third partners. If a guy wanted to pull out we would reconcile our accounts and let him pull out. No one was locked in. Q. *325 [MR. RIVIEZZO]: What happened if someone died? What was your understanding? A: [DR. HOGAN]: My understanding was that if I died, my wife would have my share and my two partners would take care of her the same way as they were taking care of me. * * * Q. [MR. RIVIEZZO]: Can you describe your understanding of what the impact would be in the event of a liquidation -- the impact of these allocations -- Did you have an understanding what effect that would have on you in the event of a liquidation of the partnership today? A. [DR. HOGAN] My understanding is -- MS. WILLIAMS: Objection, Your Honor. It is really irrelevant if they liquidate the partnership today. THE COURT: Rephrase the question. Q. [MR. RIVIEZZO]: Liquidation as of -- A. [DR. HOGAN]: If we liquidated in 1981 or 1982 or the years in question? Q. [Mr. RIVIEZZO]: That's correct. A. [DR. HOGAN]: My understanding is that we would take all of the proceeds of the liquidation. We would add or subtract from that according to what our capital accounts at the time. A negative capital account you would add, and a positive capital account you would withdraw and whatever is left we split up three ways. That was what my understanding *326 was.
During cross-examination, however, Dr. Hogan admitted that he could not recall any instances where he and his partners had discussed or agreed upon their specific rights and obligations in the event a partner died or sought to liquidate his interest in the partnership. When questioned about what agreement the partners had reached concerning the restoration of a deficit capital account upon liquidation, Dr. Hogan testified that the partners "agreed that whatever our expert advisor told us to do would be done." [10] Based on the evidence presented, petitioners have failed to establish that the oral partnership agreement provided that any partner with a deficit capital account balance would be obligated to restore that deficit. Petitioners go on to argue that under Pennsylvania law general partners are obligated to restore any deficits in their capital accounts upon liquidation. Petitioners rely on 59 Pa. Cons. Stat. Ann. sec. 331 *327 (Purdon 1989) which, during the years in issue provided, in pertinent part: Sec. 331. Rules determining rights and duties of partners The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules: (1) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property, and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership, according to his share in the profits. * * * This provision is substantially identical to section 18(a) of the Uniform Partnership Act drafted by the National Conference of Commissioners on Uniform State Laws. Uniform Partnership Act, sec . 18(a), 6 U.L.A. 213 (1969). Petitioners do not cite any Pennsylvania cases nor do they explain why these statutory provisions should be interpreted to require the restoration of deficit capital account balances. However, petitioners cite Park Cities Corp. v. Byrd, 534 S.W.2d 668, 673-675 (Tex. 1976), for the proposition that *328 section 18(1)(a) of the Texas Uniform Partnership Act required a general partner to restore a deficit balance in her capital account. Petitioners point out that this part of the Texas partnership statute is identical to the Pennsylvania statute and, therefore, contend that they are also required under state law to restore any deficit in their capital account upon liquidation. Park Cities Corp. v. Byrd, supra, did not hold that the Texas Uniform Partnership Act required a general partner to restore a deficit balance in her capital account. Rather, the Texas Supreme Court found that the written partnership agreement in that case provided for the restoration of the deficit in the partner's capital account. The Court quoted extensively from the agreement and specifically found that "Though the specific intent of the parties is not clear, the articles of agreement signed by these partners are clear and concise and will admit of only one interpretation." Parks Cities Corp. v. Byrd, supra at 674.It is true that the Texas Supreme Court placed some reliance on provisions of the Texas Uniform Partnership Act that are the same or similar to statutes in effect in Pennsylvania, but the Court *329 made very clear that the statute was only being used for guidance as an interpretative aid and that the partnership agreement was the controlling factor: The agreement of the parties is to be controlling of our decision and we shall construe and interpret their agreement pursuant to the applicable law of contracts. See, City of Pinehurst v. Spooner Addition Water Company, 432 S.W.2d 515 (Tex. 1968).We look to the Texas Uniform Partnership Act for guidance only when the partnership agreement is silent. In this case we shall often consider it only as an interpretive aid. * * * [Park Cities Corp. v. Byrd, supra at 672.]
In Goldfine v. Commissioner, supra at 853, we expressed our view that provisions of the Illinois Uniform Partnership Act similar to those upon which petitioners rely do not make any express provision for restoration of deficits in capital accounts upon liquidation.[11] *330 Having examined the Pennsylvania statutes relied upon by petitioners, we find nothing requiring the restoration of deficit capital account balances upon liquidation. Petitioners also argue that under Pennsylvania law liquidation proceeds must be distributed in accordance with the partners' capital account balances. [12] *331 *332 Having found that petitioners have failed to prove that Dr. Hogan was obligated to restore any deficits in his capital account upon liquidation, we need not address this argument. We, therefore, conclude that the allocation of losses to Dr. Hogan lacked substantial economic effect and must be disregarded. If an agreed allocation to a partner does not have substantial economic effect, then the partner's distributive share of income, gain, deduction, loss, or credit shall be determined in accordance with the partner's interest in the partnership. Sec. 704(b). All partners' interests in the partnership are presumed to be equal. Sec. 1.704-1(b)(3)(i), Income Tax Regs. This presumption may be rebutted upon the establishment of facts and circumstances that the partners' interests in the partnership are otherwise. Sec. 1.704-1(b)(3)(i), Income Tax Regs.
The testimony of each of the partners leads to the conclusion that each of them generally understood and agreed that he was a one-third partner in Honey Hill Farm partnership. Petitioners have failed to produce evidence to establish otherwise. Accordingly, petitioners are entitled to deduct one-third of the partnership losses incurred during 1981, 1982, and 1983. Respondent also determined that petitioners are liable for an addition to tax under section 6661 for the 1982 underpayment *333 caused by the understatement of tax attributable to the Honey Hill Farm adjustment. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. [13]Pallottini v. Commissioner, 90 T.C. 498 (1988).An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). Under section 6661(b)(2)(B), an understatement may be reduced if the taxpayer shows that there was substantial authority for the taxpayer's treatment of the item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed on the return. Petitioners have presented no evidence that *334 either of these exceptions applies. Due to concessions made by both parties, the section 6661 addition to tax will have to be calculated as part of the Rule 155 computation at docket No. 18980-85. Decision will be entered under Rule 155 at docket No. 18980-85. Decisions will be entered for the respondent at docket Nos. 18970-87 and 18971-87. Footnotes
1. These cases were consolidated for trial, briefing, and opinion.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent, in his answer in docket No. 18980-85, asserted that petitioners were liable for the increased rate of interest provided for in former section 6621(d). Section 6621(d) was amended and redesignated as section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. On brief, respondent concedes this issue. Petitioners concede that respondent properly disallowed a loss from a gem distributorship claimed on their tax return for 1982. Petitioners also concede that the statute of limitations does not bar the assessment and collection of tax in docket No. 18980-85. Respondent concedes the addition to tax under section 6661 for 1982 as it relates to the loss from the gem distributorship.
4. The parties stipulated that Dr. Hogan contributed $ 50,000 in capital to the partnership during 1981. Petitioners made no objection to respondent's request for a factual finding that Dr. Hogan's 1981 capital contribution was $ 50,000. The partnership's Form 1065, U.S. Partnership Return of Income, for taxable year 1981, however, reports that Dr. Hogan contributed $ 55,000 in capital to the partnership 5. Both Dr. Hogan and Dr. DeClement claim that of the $ 110,000 contributed to the partnership during 1981 by Dr. DeClement, $ 85,000 was paid in exchange for the partnership interest and $ 25,000 was contributed toward partnership operating expenses. Dr. Hogan relies on this argument to support his contention that he contributed two-thirds of the partnership's operating capital during the years in issue. Dr. Hogan has not provided any authority for this position and we are unaware of any accounting or legal authority that supports such a position.↩
6. See note 4, supra↩.
7. A partnership agreement includes the original agreement plus any subsequent modifications agreed to by the partners. Sec. 761(c). In addition, the agreement includes any provisions of Federal, state, or local law which govern the affairs of the partnership. Sec. 1.704-1(b)(2)(ii)(h), Income Tax Regs.; see also Girgis v. Commissioner, T.C. Memo. 1987-556; Sellers v. Commissioner, T.C. Memo. 1977-70. In the case of an oral partnership agreement, all of the facts and circumstances surrounding the formation and operation of the partnership are relevant in determining the sharing ratios. Reed v. Commissioner, T.C. Memo. 1978-58; Ryza v. Commissioner, T.C. Memo. 1977-64↩. 8. The final regulations promulgated under section 704(b) were published on Dec. 31, 1985, T.D. 8065, 50 Fed. Reg. 53420 (1985), 1986-1 C.B. 254. The final regulations are effective generally for partnership taxable years beginning after Dec. 31, 1975. For partnership taxable years beginning after Dec. 31, 1975, but before May 1, 1986 (or before Jan. 1, 1987, with respect to special allocations of nonrecourse debt), however, a special allocation that does not satisfy their requirements nonetheless will be respected for purposes of the final regulations if such allocation has substantial economic effect as interpreted under the relevant case law and the legislative history of section 210(d) of the Tax Reform Act of 1976. Sec. 1.704-1(b)(1)(ii), Income Tax Regs.↩
9. The facts do not support a finding that two-thirds of the operating expenses were contributed by Dr. Hogan. Rather, the facts indicate that during the years in issue Dr. Hogan contributed $ 91,000 to the partnership and Dr. DeClement contributed $ 123,000. Mr. Hogan, the third partner, contributed no money during the years in issue, but did contribute substantial services.
10. Petitioners did not call their "expert advisor" as a witness. We can only presume that any testimony supplied by that individual would not have been favorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947).
11. In Goldfine v. Commissioner, 80 T.C. 843 (1983), we recognized that Parks Cities Corp. v. Byrd, 534 S.W.2d 668 (Tex. 1976) had placed some reliance on similar provisions of the Texas Uniform Partnership Act in finding that there was an obligation to restore a deficit capital account balance upon liquidation. In Goldfine, we found it unnecessary to decide the statutory issue because under the facts of that particular case the partnership agreement did not require the distribution of assets upon liquidation based on the partners' respective balances in their capital accounts. Goldfine v. Commissioner, supra↩ at 843.
12. Petitioners rely on 59 Pa. Cons. Stat. Ann. sec. 362 (Purdon 1989) which provided during the years in issue as follows: Sec. 362. Rules for distribution In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary: (1) The assets of the partnership are: (i) The partnership property. (ii) The contributions of the partners necessary for the payment of all of the liabilities specified in paragraph (2). (2) The liabilities of the partnership shall rank, in order of payment, as follows: (i) Those owing to creditors other than partners. (ii) Those owing to partners other than for capital and profits. (iii) Those owing to partners in respect of capital. (iv) Those owing to partners in respect of profits. (3) The assets shall be applied, in order of their declaration in paragraph (1) to the satisfaction of the liabilities. (4) The partners shall contribute, as provided by section 331(1) (relating to rules determining rights and duties of partners), the amount necessary to satisfy the liabilities; but if any, but not all, of the partners are insolvent, or, not being subject to process, refuse to contribute, the other partners shall contribute their share of the liabilities, and, in the relative proportions in which they share the profits, the additional amount necessary to pay the liabilities. * * * This provision is substantially identical to section 40 of the Uniform Partnership Act drafted by the National Conference of Commissioners on Uniform State Laws. Uniform Partnership Act, sec . 40, 6 U.L.A. 468-469 (1969).
13. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. Respondent, however, has not amended his answer to seek an increase in the section 6661(a) addition to tax over the amount determined in the notice of deficiency.↩