Durand A. HOLLADAY and Blanche F. Holladay, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 80–5274.

United States Court of Appeals, Fifth Circuit. Unit B

July 9, 1981.

Kenneth G. Anderson, Jacksonville, Fla., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Act. Chief, Appellate Section, Tax Div., Dept. of Justice, N. Jerold Cohen, Chief Counsel, Internal Revenue Service, Michael L. Paup, Jonathan S. Cohen, Daniel F. Ross, Tax Division, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before HILL, and FRANK M. JOHNSON, Jr., Circuit Judges, and SCOTT,* District Judge.

FRANK M. JOHNSON, Jr., Circuit Judge:

Durand A. Holladay [1] petitioned the United States Tax Court for a review of the federal income tax deficiencies totalling $589,396 assessed against him by the Commissioner of Internal Revenue for calendar years 1971 through 1973.[2] Holladay appeals from the Tax Court's decision in favor of the Commissioner under 26 U.S.C.A. § 7482. This case was consolidated for oral argument with *Boynton v. Commissioner,* 649 F.2d 1168 (5th Cir. 1981), and should be read in conjunction with it.

I. Facts

The factual situation involved is essentially undisputed.[3] In 1970, Charles I. Babcock, Jr., a developer and housing builder, approached Durand A. Holladay with a proposed joint venture to develop a 600-unit apartment project named the Kings Creek Apartments, which would be located in Dade County, Florida. In October 1968, Babcock had purchased 17.5 acres of undeveloped land for the apartments; 90% of the $599,000 purchase price was financed by Babcock with mortgages and promissory notes. After further financing (through Babcock Company, his personal investment company), Babcock acquired the land for $631,533.55. Babcock needed additional capital for the long term costs of the project so he approached Holladay, who had training as an engineer and a lawyer and who was a successful investor and mortgage company executive with an annual income exceeding $1,000,000.

The joint venture agreement basically provided that Babcock Company would contribute the land, plans, and construction of the project and in exchange Holladay would contribute an equity capital contribution of $750,000, a subordinated loan up to $1,000,000 and his expertise at obtaining additional institutional financing; thus Babcock would supply the construction services and Holladay would provide the long term financing for the project. The joint venture agreement was signed on July 1, 1970, and later amended on April 15, 1971.[4] When the agreement became effective on July 1, 1970, each joint venturer obtained a 50% interest in the assets of the project, that is, Babcock became one-half owner of the $750,000 equity and Holladay became one-half owner of the land.

The original agreement provided that the first available funds for distribution would repay the joint venture's obligations to Babcock and Holladay, including Holladay's subordinated loan; thereafter all funds would be divided evenly between them. The amended agreement, which is the agreement at issue, modified several provisions including the distribution provisions such that (1) every year the first $100,000 available for distribution would be divided equally, (2) Babcock Company would receive a one-time payment of $150,000 out of one-half of the balance available for distribution, (3) Holladay's subordinated loan would be repaid after three years over a five-year period, (4) other outstanding loans from the venturers would be paid, and (5) any remaining balance would be equally

---

* District Judge of the Middle District of Florida, *sitting by designation.*

1. Mrs. Blanche F. Holladay is a party to this appeal solely because she filed joint returns with her husband for the years involved.

2. We agree with Holladay that the Tax Court erred by considering tax year 1970 for substantive tax purposes; accordingly the only tax years at issue in this appeal are 1971, 1972 and 1973 as the refunds claimed by Holladay for tax years 1968–1970 were based on the net

operating loss carrybacks from the tax years 1971–1973.

3. At the end of the trial, Holladay made several unsuccessful post trial motions; one motion was for further findings of fact. However, he does not assign as error the Tax Court's denial of those motions.

4. Holladay did not send the original agreement to his attorney for review until December 1970. Subsequent to that review, the original agreement was amended on April 15, 1971.

divided (e. g., funds from apartment rentals, sale of any jointly owned assets, etc.).[5] One feature that was significantly modified by the amended agreement was Section 4 which provided that, prior to 1975, *all profits* and *losses* of the venture were to be allocated to Holladay, exclusive of any gains or losses from the sale of property or other disposition; any profits or losses not allocable to Holladay prior to 1975 were to be shared equally; and after January 1, 1975, all profits and losses were to be shared equally.[6]

Holladay contributed $750,000 equity to the project during the summer of 1970. Over the next 13-month period he advanced loans totalling $875,000 under the subordinated $1,000,000 loan provision. Thus his total investment was $1,625,000; these funds were used by the venture to reimburse Babcock Company for its pre-venture expenses such as mortgages on the project's property and various project improvements. Holladay was also instrumental in obtaining institutional financing for the project through three loans totalling $9,970,000; Holladay and Babcock (and Babcock Company) were liable for these loans as they had agreed to share equally the burden of any additional financing required after Holladay's subordinated loan was exhausted.

The joint venture's losses for tax years 1970 through 1973 were $372,412, $971,221, $617,212 and $379,364 for total losses of $2,340,209 which were all reported on Holladay's individual income tax returns for the same period. Babcock did not claim any losses for the period 1970 to 1973. A net operating loss of $267,758 was claimed for tax year 1971, which was carried back to tax years 1968 to 1970, resulting in tentative refunds of $38,914, $97,519 and $11,043 or a total of $147,476 for those years. Because the Commissioner allowed Holladay to claim only 50% of the reported $2,340,209 losses, a $589,396 deficiency was assessed against Holladay, which included the carryback years.

## II. Interpretation of Holladay's Loss Allocation Under IRC § 704(a)

The sole issue decided by the Tax Court was whether the allocation of all of the joint venture's losses to Holladay was bona fide within the meaning of Section 704 of the Internal Revenue Code of 1954, as amended, 26 U.S.C.A. § 704. *See Boynton v. Commissioner, supra,* 649 F.2d at 1171, n. 7. The Tax Court held that the 100% allocation of losses to Holladay lacked economic substance because the allocation failed to reflect the actual agreement between Holladay and Babcock regarding their respective share of the profits and losses. The court interpreted the amended agreement as providing for a nearly equal division of economic benefits given that the proceeds of the joint venture were to be distributed regardless of the amount or deficit in the capital accounts of the joint venturers. Holladay's argument that the allocation was bona fide since both joint venturers agreed to the allocation and consistently followed it was rejected by the Tax Court.

The joint venture was properly treated as a partnership for tax purposes. Treas.Reg.

---

5. The Tax Court found that the modifications of the original agreement did not significantly affect the import of pertinent provisions. One of the main reasons the agreement was amended was to include the cash flow provisions that granted Babcock priority return of his capital investment. The amended agreement established priority rights of distribution; thus Holladay's subordinated loan would not be repaid until after Babcock's $150,000 priority cash flow payment and construction fees were satisfied. All of these distributions were subordinated to the $100,000 cash flow that was to be equally divided between Babcock and Holladay.

6. All of the venture's losses "as finally determined for income tax purposes" were allocated to Holladay because the adjusted basis of the property contributed by Babcock differed "substantially from the fair market value of said property at the time of its contribution." *See* Appendix A, Original Agreement § IV(A). However, this statement was eliminated when the agreement was amended to provide that Holladay would bear all profits and losses of the venture prior to 1975. *See* Appendix B, Amended Agreement § 4(A).

§ 1.761–1(a) (1954).[7] The problem in this case is again essentially one of the proper statutory construction of IRC § 704. Holladay argues that, since the tax avoidance standard of Section 704(b)(2) concededly does not apply, the Tax Court erred in imposing a general tax avoidance standard. Moreover, he contends that, because the amended agreement here reflected a true arm's length bargain and was not a sham, *Kresser v. Commissioner*, 54 T.C. 1621 (1970) and *Frank G. Sellers* T.C. Memo 1970–70, *aff'd other issues*, 592 F.2d 227 (4th Cir. 1979), which were sham cases, do not serve as precedent. The Commissioner responds by stating that the allocation was a sham, as the only business purpose for the loss allocations to Holladay was the tax benefits Holladay would receive as a result of claiming losses he did not personally incur; Holladay conceded that those benefits induced him to join the venture. Further, the Commissioner contends that Section 704 does not exalt form over substance by allowing an allocation of profits and losses without regard to which venturer actually received the benefits or bore the losses.

 Superficially, it would appear that Holladay was entitled to a 100% loss allocation since (a) Section 4(a) of the amended agreement provided that Holladay would receive all of the profits and losses for the first five years of the venture and (b) the first $1,625,000 utilized by the venture consisted of Holladay's equity contribution ($750,000) and his subordinated loan ($875,000). As we noted in *Boynton*, the allocation of all losses to a sole contributing partner is proper if that partner bears the entire economic burden of any loss. *Boynton v. Commissioner, supra*, 649 F.2d 1168. Moreover, the existence of a tax benefit resulting from a transaction does not auto-matically make it a sham as long as the transaction is imbued with tax-independent considerations. *See Frank G. Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978); *see also Holladay v. Commissioner*, 72 T.C. 571, 594 (Fay, J., dissenting). However, there are several reasons why the Tax Court correctly disallowed the 100% loss allocation to Holladay.

██ First of all, Holladay was not the "sole contributing partner" as Babcock put up his property (and the improvements undertaken prior to the formation of the venture), plans, contracts and expertise in exchange for Holladay's capital. Once the original joint venture agreement became effective, the joint venturers became one-half owners of the assets of the venture. Thus, if the venture had failed after the agreement's execution, each venturer would have borne 50% of the loss. Moreover, as Holladay chose to characterize his $875,000 cash advance as a subordinated loan rather than a capital contribution, he is bound by the tax consequences of that characterization. *See Boynton v. Commissioner, supra*, 649 F.2d 1168. As of December 31, 1973, only $270,000 of Holladay's $875,000 subordinated loan was repaid, leaving a balance of $605,000. Holladay argues that, since this amount (plus his initial equity) was at risk during the tax years at issue and the equal sharing provisions would not become effective until after Holladay's subordinated debt was repaid (which would not occur until after certain other priorities were satisfied), the total loss allocation to him was justified. But Holladay's $875,000 advance was a loan, *not* a capital contribution; thus Holladay stood as any other lender with respect to those funds.[8]

---

**7.** Reg. § 1.761–1 provides in part:
 *Terms defined.*
 (a) *Partnership.* The term "partnership" includes a syndicate, group, pool, joint venture, or other incorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not a corporation or a trust or estate within the meaning of the Code. The term "partnership" is broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships. See Section 7701(a)(2). . . .

**8.** If the debt became worthless, Holladay could claim a deduction under the IRC's bad debt provision.

Secondly, the Tax Court's factual finding that the joint venture agreement as amended provided for a nearly equal division of economic benefits is supported by the record. For example, Babcock was equally liable for any additional financing required after Holladay's initial funds were expended. Furthermore, the cash distribution provision which had first priority, was to be implemented regardless of the status of the joint venturers' capital accounts. In other words, the allocation of losses to Holladay did not affect the amount of money either he or Babcock put in or took out of the venture, thus the allocation lacked economic effect. *Compare Harris v. Commissioner,* 61 T.C. 770, 786 (1974) *with Orrisch v. Commissioner,* 55 T.C. 395, 403 (1970). In *Harris* the Tax Court allowed a loss allocation under IRC § 704(a) because the loss allocated to the petitioner was applied to reduce proportionately his capital account and his share of future proceeds in the event of liquidation. Here, the loss allocation had no effect on Holladay's capital account or upon his share in the event of dissolution. *See* Appendix C.

Finally, the loss allocation provision must be considered within the context of the entire transaction. Section 4(a) of the amended agreement provided that Holladay would receive all of the profits and losses during the early years of the venture. Yet as Holladay's counsel conceded at oral argument, during the early years of a venture such as the one involved, the depreciation charges are so high that profits are extremely unlikely. As of 1971, the economic realities of Section 4(a) in the context of a 600-unit apartment complex were such that Holladay would receive the tax benefits of the venture's losses which were virtually certain during its early years of operation; subsequent to 1974, the time when the project would be more likely to show a profit, the joint venturers would thereafter equally divide the profits and losses. Con-

sequently, we find that the allocation of all of the venture's losses to Holladay lacked economic substance and was clearly a sham under IRC § 704(a). *See Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Boynton v. Commissioner, supra; Kresser v. Commissioner, supra; see also Thompson v. Commissioner,* 631 F.2d 642, 646 (9th Cir. 1980). Since the statutory tax avoidance test under IRC § 704(b)(2) was clearly inapplicable to this case, the Tax Court did not err in relying on the *Kresser* rationale.[9] *See Boynton v. Commissioner, supra,* 649 F.2d at 1173, n. 13. In view of the entire transaction, the joint venturers' agreement to allocate the tax benefits of certain losses to Holladay, who was not the sole contributor of the venture, lacks a valid business purpose and is ineffective for federal tax purposes. Accordingly, the Tax Court's decision that Holladay could claim only 50% of the losses for tax years 1971–1974 is AFFIRMED. However, because the basis upon which the Tax Court determined the deficiency due for tax year 1970 is unclear from the record, we REMAND solely for a recomputation of the taxes due.

## APPENDIX A

The Original Joint Venture Agreement provided in part:

III. FINANCING AND OWNERSHIP.

A. *Capital Contributions.*

The contribution of Babcock Co. to the capital requirements of the Joint Venture shall be its equity in the Land, subject to all mortgages, liens, charges and to the obligation to pay for work performed on the Land and buildings located thereon, which shall produce a capital account of approximately $275,000.00 and the contribution of Mr. Holladay to the capital requirements of the Joint Venture shall

---

9. As many of the commentators on the 1976 amendment of IRC § 704(b) have noted, Congress wanted specifically to include the substantial economic effect test as stated in *Kresser* as the proper test for a bottom line alloca-

tion such as the one involved in this case. *See, e. g.,* McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners § 10.01[2] (1977).

be $750,000.00, of which $250,000.00 is to be in cash at or about the time of the execution and delivery of this Agreement and the balance of $500,000.00 is to be contributed during the calender year 1970 from time to time as needed.

B. *Proportionate Interest.*

Subject to the provisions of Article III. A. hereof, each of the Joint Venturers shall have a one-half (½) interest in and to all real and personal property, monies and profits of the Joint Venture and the respective shares of the Joint Venturers in all losses, expenses, obligations and liabilities of the Joint Venture shall be as follows:

1. Before any repayment of loans to the Joint Venturers, the sum of $100,-000.00 shall be distributed equally to the Joint Venturers out of the first monies available for distribution.

2. After the payments provided for in paragraph 1 any loans made to the Joint Venture shall be repaid in such a manner that the loans from the Joint Venturers shall be equalized. The first monies therefore shall be applied to pay off the loan of $1,000,000.00 to be made by Mr. Holladay to the Joint Venture together with interest thereon.

C. *Borrowing.*

Mr. Holladay agrees to lend to the Joint Venture as and when needed the total sum of $1,000,000.00 which is to be secured by a second mortgage on the project (subordinate to loans for construction and permanent financing), at the interest rate charged from time to time by the First National Bank of Miami to Mr. Holladay. The interest shall be accrued, however, for the first three (3) years from the date of the original loan. Repayment of principal and interest shall commence at the beginning of the fourth year and shall be payable in equal quarter-annual installments including principal and interest over the following five (5) year period, provided, however, that the payments required thereunder shall not be greater than the cash available after the payments to the Joint Venturers under paragraph, B. 1. hereof, and

further provided that the term shall be extended for the time necessary to provide full payment under this provision. The deferred interest shall not bear interest. To the extent deemed necessary or advisable, the financial requirements of the Joint Venture in excess of the sum of $1,750,000.00 (being the $750,000.00 contribution and $1,000,000.00 loan heretofore mentioned) shall be satisfied from sources outside the Joint Venture and to this end Babcock Co. and Mr. Holladay agree that such financing shall be provided by each party equally and shall not be secured by any pledge or mortgage of the assets of the Joint Venture. Nothing in this paragraph C shall give 'or be construed to give to either party hereto the right, power or authority to create any liability on the part of the other party hereto for the payment of any such indebtedness.

IV. DISTRIBUTION OF LOSSES AND OF PROFITS.

A. The Joint Venturers understand that for income tax purposes the Joint Venture's adjusted basis in the property contributed by Babcock Co. differs substantially from the fair market value of said property at the time of its contribution. For that reason Mr. Holladay is to bear all losses of the Joint Venture incurred during the years 1970, 1971, 1972, 1973 and 1974. Said losses shall be as finally determined for Federal income tax purposes. In determining the respective Joint Venturers' distributive shares of each item of gross income and expense, the following rules (if a loss occurs) shall be applicable for the years 1970, 1971, 1972, 1973 and 1974.

1. Each item of gross income shall be allocated equally to each Joint Venturer.

2. A percentage of each item of expense (the same percentage for each expense) will be allocated to Babcock, the total dollar amount of which will be in the aggregate an amount equal to one-half of the gross income of the Joint Venture. The remaining expenses will be allocated to Mr. Holladay.

If in any year a gain occurs or if a loss occurs subsequent to 1974, then each item of gross income and each item of expense shall be allocated equally to each Joint Venturer.

B. After payment of the monies to be paid to Babcock Co. and to Mr. Holladay and the repayment of principal and interest on the loan from Mr. Holladay as provided for in Article III and subject to the retention by the Joint Venture of a reasonable reserve, for the business of the Joint Venture or for other contingencies, all funds arising or realized from the following sources shall be divided equally between the Joint Venturers and shall be deemed available for distribution.

## APPENDIX V

The Amended Joint Venture Agreement provided in part:

### 3. FINANCING AND OWNERSHIP.

A. *Capital Contributions.* The contribution of Babcock to the capital requirements of the Joint Venture consisted of its equity in the Land, subject to all mortgages, liens, charges and to the obligation to pay for work performed on the Land and buildings located thereon, for which his capital account has been credited approximately $275,000, and the contribution of Holladay to the capital requirements of the Joint Venture consisted of cash in the amount of $750,000, for which his capital account has been credited a like amount.

B. *Borrowing.* Holladay agrees to lend to the Joint Venture as and when needed the total sum of $1,000,000 which is to be secured by a second mortgage on the project (subordinate to loans for construction and permanent financing). Said loan shall bear interest at a rate of two and one-half percent (2–½%) above the prime rate charged from time to time by The First National Bank of Miami. The interest shall be accrued, however, for the first three (3) years from the date of the initial loan of monies. Repayment of principal and interest shall commence at the beginning of the fourth year and shall be payable in equal quarter-annual installments including principal and interest over the following five (5)–year period; provided, however, and notwithstanding the tenor of the note and mortgage, should the Joint Venture have insufficient cash to make payment in full of any installment of principal and interest, including any deficiency carried over from previous payment dates, as hereafter provided, then, in that event, the deficiency shall be carried forward to the next ensuing quarterly payment date and become then due and payable, save that if there are insufficient funds to pay the ensuing quarterly payment and/or any deficiency or deficiencies from prior payment dates, then the deficiency in payment shall be carried forward to successive payment dates. All deficiencies unpaid upon the expiration of the five (5)–year period shall be payable in ensuing quarterly installments in an amount equal to the quarterly principal payments due during the original five (5)–year term of the note, together with interest thereon at the rate above stipulated, except that no interest shall be charged on the interest accrued during the first three (3) years from the date of the initial advance of monies. All payments on the note shall be applied first to the quarterly installment of principal then due, next to the principal portion of any deficiency then due, thereafter to current interest due, and lastly to delinquent interest. The principal and interest payments on the aforesaid note shall be subordinated to the debt owing The Babcock Company for the construction fee under paragraph 6.B. As between Holladay and Babcock principal and interest payments on the aforesaid note shall also be subordinated to the payments provided to be made to them pursuant to the provisions of paragraphs 5.A(1) and (2).

C. *Additional Financing.* To the extent deemed necessary or advisable, the financial requirements of the Joint Venture in excess of the sum of $1,750,000

(being the $750,000 contribution and $1,000,000 loan heretofore mentioned) shall be satisfied from sources outside the Joint Venture and to this end Babcock and Holladay agree that such financing shall be provided by each party equally and shall not be secured by any pledge or mortgage of the assets of the Joint Venture. Nothing in this paragraph C shall give or be construed to give to either party hereto the right, power or authority to create any liability on the part of the other party hereto for the payment of any such indebtedness.

### 4. ALLOCATION OF PROFITS AND LOSSES.

A. For calendar years prior to 1975, Holladay shall be entitled to all profits and shall bear all losses of the Joint Venture arising from the conduct of the business of the Joint Venture, exclusive of (i) gains and losses from the sale, transfer or other disposition of property, real or personal, or (ii) any gain or loss of an extraordinary or non-recurring nature not normally considered an operating gain or loss pursuant to usual and accepted accounting practices and procedures.

B. For all calendar years prior to 1975, all gains and losses not allocable to Holladay pursuant to subparagraph A above, shall be shared or borne, as the case may be, by Holladay and Babcock, equally.

C. For all calendar years subsequent to 1974, Holladay and Babcock shall share equally in all profits, gains and losses.

### 5. DISTRIBUTIONS.

A. Distributions to the Joint Venturers of monies and property of the Joint Venture arising from every source, including, but not limited to those hereafter set forth, whether in liquidation of the Joint Venture or otherwise, shall be applied in the following order of priority;

(1) First, there shall be distributed each year to the Joint Venturers, equally, as soon after the close of each year as may conveniently be done, from cash available for distribution (i. e. cash not required to meet expenses and anticipated expenses in excess of anticipated receipts, and a reasonable reserve for contingencies) a sum not in excess of One Hundred Thousand Dollars ($100,000);

(2) Second, to Babcock, annually, one-half of all cash available for distribution, after distributions pursuant to subparagraph (1) above, until payments to Babcock pursuant to this subparagraph aggregate the sum of One Hundred Fifty Thousand Dollars ($150,000), said sums to be charged directly to its capital account.

(3) Third, no distributions, other than those set forth in subparagraphs (1) and (2) above, shall be made to the Joint Venturers until payment in full of the loan referred to in paragraph 3.B hereof;

(4) Fourth, to the repayment of advances made pursuant to paragraph 3.C by one Joint Venturer in excess of the advances by the other Joint Venturer, so as to equalize the amount of advances by the Joint Venturers;

(5) Fifth, to the equal repayment of advances made by the Joint Venturers pursuant to paragraph 3.C hereof;

(6) Sixth, to the repayment of the undrawn profits of each Joint Venturer, distributions pursuant to this subparagraph to be divided between the Joint Venturers in the proportion in which the undrawn profits of each of them bears to the total undrawn profits;

(7) Last, to the Joint Venturers, equally.

B. The sources of monies and property available for distribution as above set forth, shall include:

(1) All net receipts, which shall mean the excess of cash receipts over the sum of cash expenditures and accrued expenses derived from the ownership and operation of the business and properties of the Joint Venture as determined in accordance with generally accepted

accounting principles applicable to the business conducted by the Joint Venture, except that (a) depreciation of buildings, improvements, and personalty shall not be considered as a deduction from cash receipts, and (b) payment in reduction of principal of any obligation secured by any property of the Joint Venture, shall be considered as a deduction from cash receipts;

(2) The net proceeds from the sale of any part or all of the property owned by the Joint Venture;

(3) The amount, if any, by which the proceeds received by the Joint Venture from (a) permanent financing exceeds the cost of construction of completed buildings or the principal amount of construction loans, whichever is greater, and (b) refinancing of any permanent secured debt exceeds the principal balance of such debt immediately prior to such refinancing, less expenses incurred by the refinancing; and

(4) Any other monies or property deemed available for distribution by the Joint Venturers to the extent permitted by law.

C. All distributions shall be made annually or at any more frequent intervals that the Joint Venturers may select from time to time. The amount of each such distribution to a Joint Venturer, shall be available to that Joint Venturer regardless of whether it creates or increases a deficit in that Joint Venturer's capital account.

D. For the purposes of this Agreement, neither a reimbursement to a Joint Venturer for expenditures properly considered as a cost or expense of the Joint Venture, nor the payment by the Joint Venture of any fee to a Joint Venturer shall be considered a distribution of funds to a Joint Venturer; and Babcock may make any such reimbursement, payment, or repayment prior to any distribution of funds to a Joint Venturer under this paragraph 5.

E. The Joint Venturers agree that to the extent practicable, the Joint Venture shall retain sufficient funds to meet its fiscal needs.

6. CONTROL AND MANAGEMENT.

A. Except as otherwise herein expressly provided, the business and affairs of the Joint Venture shall be controlled by the decision of the Joint Venturers. It is contemplated that the Joint Venturers will meet from time to time at their convenience and that either Joint Venturer may be represented at a meeting by a duly authorized representative. Meetings may be called upon one week's notice, at a time fixed by either Joint Venturer, at the place of business of the Joint Venture in Dade County, Florida, or at a place mutually acceptable to the Joint Venturers. . . .

APPENDIX C

KINGS CREEK JOINT VENTURE

SCHEDULE OF CAPITAL ACCOUNT BALANCES
PER RETURNS AS FILED

| | Durand A. Holladay Capital Account | Charles I. Babcock Capital Account | Total |
|---|---|---|---|
| Original capital contribution in y/e 12/31/70 | $ 750,000 | $275,622 | $1,025,622 |
| Ordinary loss in y/e 12/31/70 | ( 355,139) | | ( 355,139) |
| Additional first-year depreciation | ( 4,000) | | ( 4,000) |
| Capital account balances at 12/31/70 | 390,861 | 275,622 | 666,483 |

KINGS CREEK JOINT VENTURE

SCHEDULE OF CAPITAL ACCOUNT BALANCES
PER RETURNS AS FILED

| | Durand A. Holladay Capital Account | Charles I. Babcock Capital Account | Total |
|---|---|---|---|
| Ordinary loss in y/e 12/31/71 | ( 971,221) | | ( 971,221) |
| Unearned rent income | ( 57,435) | | ( 57,435) |
| Capital account balances at 12/31/71 | ( 637,795) | 275,622 | ( 362,173) |
| Ordinary loss in y/e 12/31/72 | ( 617,212) | | ( 617,212) |
| Unearned rent income reversing | 57,435 | | 57,435 |
| Unearned rent income | ( 9,080) | | ( 9,080) |
| Withdrawals and distributions | ( 50,000) | ( 140,000) | ( 190,000) |
| Capital account balances at 12/31/72 | ( 1,256,652) | 135,622 | ( 1,121,030) |
| Ordinary loss in y/e 12/31/73 | ( 379,364) | | ( 379,364) |
| Unearned rent income reversing | ( 9,080 | | ( 9,080 |
| Unearned rent income | ( 3,005) | | ( 3,005) |
| Withdrawals and distributions | ( 50,000) | ( 110,000) | ( 160,000) |
| Capital account balances at 12/31/73 | ( 1,679,941) | 25,622 | ( 1,654,319) |
| Ordinary loss in y/e 12/31/74 | ( 307,471) | | ( 307,471) |
| Unearned rent income reversing | 3,005 | | 3,005 |
| Unearned rent income | ( 3,015) | | ( 3,015) |
| Withdrawals and distributions | ( 87,500) | ( 87,500) | ( 175,000) |
| Capital account balances at 12/31/74 | ($2,074,922) | ($ 61,878) | ($2,136,800) |