HAROLD M. REYNOLDS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reynolds v. Commissioner
Docket No. 8087-84.
United States Tax Court
T.C. Memo 1987-261; 1987 Tax Ct. Memo LEXIS 261; 53 T.C.M. (CCH) 887; T.C.M. (RIA) 87261; May 26, 1987; Reversed November 16, 1988 Thomas A. Caldwell and Joanne C. Beckman, for the petitioner. Vallie C. Brooks, for the respondent. KORNER
MEMORANDUM OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Tax Year
Ended
Deficiency
December 31, 1974
$28,790.00
December 31, 1977
[1] 380,364.50
After concessions by petitioner, the sole issue for decision *263 is whether and to what extent petitioner must recognize in 1977 a gain on the sale of certain mineral rights and leasehold interests. This case was submitted for decision on fully stipulated facts pursuant to Rule 122. [2] The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. [3]
At the time the petition was filed herein, petitioner resided in Signal Mountain, Tennessee. For each of the taxable years 1974, 1975, and 1976, petitioner filed a joint Federal income tax return with his then wife, Lohvlohn H. Reynolds ("Mrs. Reynolds"). Petitioner and Mrs. Reynolds each filed *264 separate Federal income tax returns for the 1977 taxable year. Petitioner was a businessman involved in the coal business during 1971, the year he first met Mrs. Reynolds. The two were married in that same year, and thereafter, Mrs. Reynolds terminated her employment in a chiropractor's office and began to assist petitioner in his business. Around the time of the marriage, petitioner purchased a coal mining business for $550,000. [4] To finance the purchase, petitioner secured the guaranty of two friends from Atlanta and organized Lucky Cumberland Mines Corporation ("Lucky Cumberland"). The stock of the corporation was originally placed in the name of Mrs. Reynolds and the two Atlanta friends. Mr. Reynolds later arranged for Lucky Cumberland to repurchase the stock from his friends, leaving Mrs. Reynolds as the sole stockholder. After "proving up" coal lands owned by Lucky Cumberland, petitioner sold the lands to Marquette Cement Corporation for $2,500,000. [5]
After the sale of the coal lands, on April 13, 1976, a partnership known *265 as LHR & Associates ("LHR") was formed. Ownership of LHR was distributed between Darlene K. Johnston, Mrs. Reynolds' daughter from a previous marriage ("Ms. Johnston"), Mrs. Reynolds, and a trust that was also formed on April 13, 1976 and that named Mrs. Reynolds as trustee and petitioner as beneficiary (the "LHR Trust"). [6] The trust and partnership agreements indicate that Ms. Johnston, Mrs. Reynolds, and the LHR Trust owned LHR as follows: Percent Ownership
Interest in profits
and losses of LHR
Partner
10
Ms. Johnston
36
Mrs. Reynolds
54
LHR Trust for the
benefit of petitioner
The LHR Trust instrument provides that the entire net income of the partnership attributable to the interest held in trust for petitioner is to be distributed currently and grants petitioner the right at any time to alter, amend, or terminate the trust and the right to replace the trustee. *266 On November 9, 1977, petitioner, Mrs. Reynolds, and LHR sold their interest in certain mineral rights and leasehold interests to Gold Fields Mining Corporation, a Delaware corporation ("Gold Fields"), pursuant to a document known as the Exclusive Exploration, Loan and Option Agreement (this sale will hereinafter be referred to as the Gold Fields Transaction). The sales price for the assets sold to Gold Fields under the terms of the Exclusive Exploration, Loan and Option Agreement was $10,000,000 which included the value of a tract of land to be received by petitioner valued at $117,000. Gold Fields paid the purchase price remaining after deduction of the value of the land, a total of $9,883,000, as follows: Year
Amount
1977
$7,383,000
1978
500,000
1979
1,000,000
1980
1,000,000
Total
$9,883,000
The mineral rights included in the sale were held in trust pursuant to a trust agreement dated April 14, 1976 naming James W. Kelly as trustee, and petitioner and Mrs. Reynolds as beneficiaries (the "Kelly Trust"). The leases included in the sale were held by LHR. On November 14, 1977, a Distribution and Settlement Agreement ("the Distribution and *267 Settlement Agreement") dividing the proceeds from the Gold Fields Transaction was entered into between petitioner and Mrs. Reynolds. The Distribution and Settlement Agreement, which was consented to by Ms. Johnston, first lists certain obligations which were to be satisfied out of the proceeds of the Gold Fields Transaction and then divides the remaining proceeds among Ms. Johnston, Mrs. Reynolds, and petitioner, purportedly in accordance with their ownership of LHR and the LHR and Kelly Trusts. Pursuant to the Distribution and Settlement Agreement, the 1977 payment by Gold Fields, after the deduction of certain items not relevant here, was to be $7,383,000, divided as follows: Petitioner
$3,763,000.00
Mrs. Reynolds
3,071,545.50
Ms. Johnston
397,553.00
The following amounts were reported as gross sales proceeds by the respective parties on their 1977 Federal individual income tax returns as a result of the Gold Fields Transaction: Petitioner
$3,763,000.00
Mrs. Reynolds
[7] 3,222,447.00
Ms. Johnston
397,553.00
*268 Mrs. Reynolds disappeared after she received her share of the 1977 payment. Petitioner did not see or hear from her again until December 9, 1977, when he was served with a complaint for divorce and property settlement filed by Mrs. Reynolds in the Circuit Court for Hamilton County, Tennessee. On January 5, 1978, petitioner filed an answer and counterclaim in the divorce suit wherein he denied that Mrs. Reynolds was entitled to a divorce for his cruel treatment and alleged that he was the wronged party entitled to a divorce. He further alleged that Mrs. Reynolds held title to certain properties solely as the trustee of resulting and constructive trusts of which he was the beneficiary, and that he was the equitable owner of the properties. Petitioner also claimed equitable ownership in the entire proceeds from the sales price of the Gold Fields Transaction, including those amounts already distributed to Mrs. Reynolds and Ms. Johnston. In her answer to the counterclaim, filed March 31, 1978, Mrs. Reynolds alleged that as a result of the Distribution and Settlement Agreement she was assigned $3,000,000 from the Gold Fields Transaction. On April 18, 1979, the Circuit Court of Hamilton *269 County filed its opinion in the divorce suit wherein the court found in favor of petitioner. As to the Distribution and Settlement Agreement the court stated: Mrs. Reynolds was a continuing obstacle at the Gold Fields closing. However, Mr. Reynolds was convinced that she was sincere in her insistence that money be set aside for their future security, and relying upon her representation, he willingly placed these large sums of money in her name and her daughter's name in accordance with his past customary action of placing property in names other than his own to avoid creditors, taxes, and notoriety of his ownership. To satisfy her, he took this action knowing that there would be more taxes because of money received rather than an exchange of properties. * * * * * * The Court finds that Mrs. Reynolds completely misrepresented to Mr. Reynolds what she intended to do with the money and that this amounts to fraud. Obviously her plan failed to include Mr. Reynolds' security. The [Distribution and Settlement Agreement] which has been signed by the parties is declared null and void and must be vacated because it did not in any way meet the understanding of the parties. The *270 court awarded Mrs. Reynolds $2,000,000 as her share of marital property but awarded petitioner a judgment against Mrs. Reynolds for $1,008,891.24 which represented the amount of cash in excess of the $2,000,000 that Mrs. Reynolds and Ms. Johnston had received from the proceeds of the sale in the Gold Fields Transaction. [8]
In an opinion filed on September 12, 1980, the Court of Appeals of Tennessee, Eastern Section, affirmed the judgment of the trial court in the divorce action. In its opinion the court of appeals specifically addressed and affirmed the trial court on each of the following issues: (1) Whether the trial court should have granted a divorce to petitioner rather than Mrs. Reynolds; (2) whether Mrs. Reynolds was awarded her equitable share of the marital property; and (3) whether the trial court was correct in declaring the Distribution and Settlement Agreement void. As to the third issue, the court found that because all of the elements of fraud *271 were present it was proper for the trial court to void the agreement. By order dated November 24, 1980, the Supreme Court of Tennessee denied the application of Mrs. Reynolds for permission to appeal the decision of the court of appeals. On April 6, 1981, the United States Supreme Court denied a petition for writ of certiorari filed by Mrs. Reynolds. On April 9, 1981, petitioner filed an involuntary petition in bankruptcy against Mrs. Reynolds in the United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division. On April 17, 1981, Mrs. Reynolds filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division. [9] Petitioner filed a complaint against Mrs. Reynolds to lift the stay in the Chapter 11 proceeding in order to gain possession of the marital assets awarded to him, that were in possession of the disbursing agent in the bankruptcy case. The grounds stated in the complaint were: (1) that the assets were not property of the bankruptcy estate as the divorce decree, which was then final, vested title to the property in petitioner; and (2) that the assets *272 represented property procured by the fraud of Mrs. Reynolds. On December 20, 1983, an order was entered in the bankruptcy proceeding approving a compromise settlement of the claim filed by petitioner whereby Mrs. Reynolds was to pay petitioner the $1,008,891.24 he had been awarded in the divorce action. On July 16, 1982, Mrs. Reynolds filed a complaint against respondent in her bankruptcy case seeking a refund of income tax in the amount of $284,001. The claim was based on her contention that the long term capital gain reported on her 1977 income tax return as a result of the Gold Fields Transaction was actually a property settlement pursuant to the court's opinion in the divorce case and therefore nontaxable. In response, respondent filed an answer and notice of deficiency against Mrs. Reynolds for that same year. The notice of deficiency *273 disallowed Mrs. Reynolds' refund claim on the ground that the claim was based on events occurring after 1977 and additionally determined a deficiency of $1,104,153 for unrelated items. The refund claim and related deficiency in the bankruptcy court were settled on April 3, 1984. Under the stipulation of settlement approved by the bankruptcy court, Mrs. Reynolds agreed to dismiss her refund claim and agreed to an income tax due and owing for 1977 of $440,150 exclusive of interest. [10]
On September 25, 1984, Mrs. Reynolds filed a complaint in her bankruptcy proceeding for a determination of her tax rights and liabilities for 1983. In her trial brief in this matter, Mrs. Reynolds contended that she was entitled to a deduction under section 1341 for 1983 in the amount of $1,008,891.24 paid to petitioner in that year pursuant to the suit filed by petitioner against Mrs. Reynolds in the bankruptcy action to collect the judgment awarded him *274 in the divorce suit. By letter dated April 10, 1985 to the Department of Justice, Mrs. Reynolds proposed to resolve various adversary proceedings (including the complaint filed September 25, 1984) and her income tax liability for all periods ending as of May 31, 1985 for the combined sum of $235,205 with $60,000 paid on confirmation of a proposed plan and the balance to be paid in 1989 with interest accruing at nine percent after February 1, 1986. The proposal called for respondent to concede Mrs. Reynolds' claim for an adjustment under section 1341 for 1983. [11] The proposal was set forth in a modified plan of reorganization that was filed with the bankruptcy court on July 1, 1985. By orders filed on December 6, 1985, the bankruptcy court confirmed the modified plan of reorganization as further modified in open court and dismissed with prejudice each of the adversary proceedings filed by Mrs. Reynolds. On his individual income tax return for 1983, petitioner reported gross receipts received from Mrs. Reynolds of $1,008,891.24 less $150,991.24 *275 held in escrow or a net amount of $857,900. On a separate schedule explaining this item, petitioner stated that the amount was received by him as a part of a division of marital property and therefore nontaxable to him. He stated, however, that in order to induce Mrs. Reynolds to make the payment, he agreed to treat the amount as a repayment deductible by Mrs. Reynolds under section 1341 and therefore taxable to him under the same section. Petitioner maintained that in the event such amount is disallowed as a deduction to Mrs. Reynolds, it will be his position that the amount is not taxable to him. [12]
In the notice of deficiency issued in this case, respondent determined that petitioner realized an additional capital gain in 1977 from the Gold Fields Transaction in the amount of $1,704,174.45. *276 Respondent determined that this gain should have been reported by petitioner rather than Mrs. Reynolds. Burden of Proof
As a preliminary matter, we must first decide which party must bear the burden of proof on the capital gain issue. As is indicated above, respondent determined in his notice of deficiency that petitioner realized an additional long-term capital gain in 1977 from the sale of mineral rights and leases in the amount of $1,704,174.45. The increased gain is based on a determination that Mrs. Reynolds' share of proceeds from the sale was $1,999,970.02. Respondent later determined that the sales proceeds were actually $3,071,545.50. As a result, respondent filed an amended answer and thereby increased the deficiency he determined from $380,364.50 to $808,524.33. [13]
Rule 142(a) provides in relevant part that: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined *277 by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent. * * * In Virginia Education Fund v. Commissioner,85 T.C. 743, 751 (1985), affd. 799 F.2d 903 (4th Cir. 1986), we summarized the definition of "new matter" by stating: The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. Estate of Jayne v. Commissioner,61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner,50 T.C. 478, 492-493 (1968); Estate of Scharf v. Commissioner,38 T.C. 15, 27-28 (1962). However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. Estate of Falese v. Commissioner,58 T.C. 895, 898-899 (1972); *278 McSpadden v. Commissioner,supra;Papineau v. Commissioner,28 T.C. 54, 57 (1957); Tauber v. Commissioner,24 T.C. 179, 185 (1955). * * * [quoting Achiro v. Commissioner,77 T.C. 881, 890 (1981).] On our facts it is clear that respondent has adequately raised the issue of whether petitioner is required to report an additional capital gain for the sale of mineral rights and leases during 1977. The notice of deficiency clearly states that petitioner realized an additional capital gain from a sale of such rights for that year. This issue, as more fully developed in the pleadings, is really whether the gain was required to be reported entirely by petitioner, or whether parts of the gain were instead reportable by Mrs. Reynolds and Ms. Johnston. The issue was raised in the notice in that the notice requires petitioner to report more gain from the sale than he originally reported. For this reason, the burden of proof as to who was the proper taxpayer to report the gain, as originally determined by respondent, remains with petitioner. The amended answer, on the other hand, does increase the amount of the deficiency. *279 It is well settled that if an amended answer increases the original deficiency, the burden of proof shall shift to the Commissioner for the increased amount of the deficiency. See, e.g., Estate of Schneider v. Commissioner,29 T.C. 940, 956 (1958); Rule 142(a). Hence, respondent has the burden as to establishing that the amount in excess of the amount in the notice of deficiency was properly reportable by petitioner as capital gain. Division of the Capital Gain
The assets sold in the Gold Fields Transaction consisted of mineral leases purportedly owned by LHR and mineral rights purportedly owned by the Kelly Trust. As indicated supra, the Distribution and Settlement Agreement divides the proceeds from the Gold Fields Transaction essentially in accordance with the purported ownership of LHR and the Kelly Trust. The proceeds attributable to the mineral leases were divided among the LHR partners: Ms. Johnston, Mrs. Reynolds and the LHR trust (in turn consisting of petitioner). The proceeds attributable to the mineral rights were divided equally between petitioner and Mrs. Reynolds as beneficiaries of the Kelly Trust. We must thus determine for Federal *280 tax purposes whether LHR was a valid partnership with valid partners and whether the Kelly Trust was a valid trust during 1977. Petitioner contends that Mrs. Reynolds and her daughter held title under the agreements to the mineral rights and/or leases and that it was therefore proper for Mrs. Reynolds and her daughter to report their respective shares of the gain. Petitioner further asserts that, in any event, the parties to these agreements correctly reported their shares of gain under the claim of right doctrine. Respondent argues, citing Lucas v. Earl,281 U.S. 111 (1930), that the trust, partnership, and Distribution and Settlement agreements amounted to nothing more than an attempt to assign a portion of the gain on the Gold Fields Transaction from petitioner to Mrs. Reynolds and her daughter. Respondent therefore takes the position that the entire gain on the transaction should have been reported by petitioner on his 1977 income tax return. Turning first to the validity of LHR and its partners, we note that neither party has raised the family partnership provisions contained in section 704(e) despite their apparent applicability. [14] This Court has stated, *281 however, that irrespective of whether section 704(e) has direct application to the facts of a particular case, "the factors set forth in section 704(e) can be used as guides for determining whether a valid partnership existed." Cirelli v. Commissioner,82 T.C. 335, 343 (1984). Moreover, it is clear that regardless of any direct or indirect impact section 704(e) may have, the doctrine of substance over form has a pervasive application which cuts across any specific provision of the Code. Cirelli v. Commissioner,supra.[15] Hence, while we do not decide whether section 704(e) is directly applicable we may look to that section and the regulations thereunder for assistance in determining whether LHR is to be respected.[16]
*282 Whether a partner "owns" a capital interest in a partnership (the word utilized in sec. 704(e)) is a mixed factual and legal issue to be determined from the totality of the circumstances. Sec. 1.704-1(e), Income Tax Regs.; Ginsberg v. Commissioner,502 F.2d 965, 967 (6th Cir. 1974), affg. a Memorandum Opinion of this Court; Pflugradt v. United States,310 F.2d 412, 416 (7th Cir. 1962); Ketter v. Commissioner,70 T.C. 637, 643 (1978), affd. without published opinion 605 F.2d 1209 (8th Cir. 1979). Family partnerships must be closely scrutinized by the courts, since the family relationship "so readily lends itself to paper arrangements having little or no relationship to reality." Kuney v. Frank,308 F.2d 719, 720 (9th Cir. 1962). See also Commissioner v. Culbertson,337 U.S. 733, 746 (1949); S. Rept. No. 781, 82d Cong., 1st Sess. 38-40 (1951), 1951-2 C.B. 458, 485-486; H. Rept. No. 586, 82d Cong., 1st Sess. 32-34 (1951), 1951-2 C.B. 357, 380-381; W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 14.01 (1977). *283 "Mere shams" will not be recognized for Federal tax purposes. Spiesman v. Commissioner,28 T.C. 567 (1957), affd. 260 F.2d 940 (9th Cir. 1958); Fiore v. Commissioner,T.C. Memo. 1979-360, affd. without opinion 636 F.2d 1208 (3d Cir. 1980). The regulations under section 704(e) list a series of factors to be considered in determining whether a partner is, in fact, the real owner of a capital interest in the partnership. The factors to be considered, which are illustrative rather than exhaustive ( Ketter v. Commissioner,supra at 648), break down into five categories: retained controls, indirect controls, participation in management, income distributions, and conduct of partnership business. See sec. 1.704-1(e)(2), Income Tax Regs.; Cirelli v. Commissioner,supra at 345. The critical fact in this case is the absolute control petitioner exercised over every aspect of the partnership and its business. The record clearly indicates that petitioner rather than Mrs. Reynolds or her daughter, controlled LHR to the point where neither the wife nor her child can be viewed as partners in *284 the partnership. It is clear that during their marriage, petitioner, not Mrs. Reynolds, was the person involved with managing the coal mining businesses. For example, in the Lucky Cumberland Mines Venture, it was petitioner's friends who guaranteed the loan for the purchase of the coal lands. He made all the contacts in the coal fields and made all the financing and selling arrangements before he brought in Mrs. Reynolds for the formal signing of the documents. This same control over management of the business continued with LHR. It was petitioner who worked long hours in the field proving up the coal lands for LHR while Mrs. Reynolds, who had no prior business experience, was at most an office manager, although even this label is misleading as most of the bookkeeping for the business was performed by an accountant. Similarly, it was petitioner who revised payment schedules and made the arrangements for the sale of the coal leases owned by LHR. He ultimately received offers of four million dollars and six million dollars, both of which Mrs. Reynolds urged him to accept. Yet he chose to continue negotiating and finally accepted an offer of 10 million dollars -- further evidence *285 that it was he rather than Mrs. Reynolds who made the partnership decisions. [17]
Petitioner's customary practice was to place property in names other than his own to avoid creditors, and the notoriety of his ownership. This practice continued with LHR where at Mrs. Reynolds' behest he placed ownership of partnership interests in her and her daughter's names so as to provide for the family's future security. But as petitioner stated in response to an interrogatory in the divorce action, "I regarded myself as the beneficial owner of the partnership subject to Darlene Johnston's possible right to a 10 percent interest." As the trial court stated in the divorce action, "The Court finds that Mrs. Reynolds is responsible for her daughter having received any monies [from LHR] and that there is no consideration from the daughter which justified her receiving these funds." These facts convince us that it was petitioner who was in complete control of LHR, and petitioner has not offered any evidence to the contrary. Petitioner did *286 not, for example, offer evidence that anyone other than himself retained direct or indirect control of the partnership, participated in management, or was active in the conduct of partnership business in any fashion. What the record does reveal is that Mrs. Reynolds and her daughter received large amounts of income from the sale of partnership assets without substantially contributing to the production thereof. On our facts, the inquiry into the validity of LHR leads us next to an inquiry into the validity of the LHR Trust, the principal "partner" therein. The question of whether the LHR Trust was a valid partner is, again, one of fact to be resolved in light of all the circumstances. It -- must be established not only by the legal documents by which [it was] purportedly created but also by evidence showing that the trustee actually became a bona fide partner acting for the interests of the beneficiary of the trust rather than for the interests of the [donor]. [See Acuff v. Commissioner,35 T.C. 162, 175 (1960), affd. per curiam *287 296 F.2d 725 (6th Cir. 1961).] A closer examination of the LHR Trust instrument reveals that petitioner was at all times in command of LHR's destiny. The instrument provides that Mrs. Reynolds as trustee was required to exercise all rights and powers and perform all duties and obligations of the partnership which are attributable to the partnership interest held in trust for the beneficiary, petitioner -- "in accordance with the instructions and directions of the Beneficiary * * *." The instrument also provides that petitioner had the right at any time to alter, amend, or terminate the trust and to replace the trustee. These provisions tend to show that control of the LHR Trust was in reality vested in petitioner. [18]
*288 It is also significant that petitioner did not offer any evidence that Mrs. Reynolds, as trustee, ever actively represented the trust as an independent factor in the management and operation of the business. See Ginsberg v. Commissioner,502 F.2d at 966-967. Nor does the record indicate that the LHR Trust was ever held out as a partner to customers or creditors of the partnership or banks with which the partnership did business or by the filing of any certificate of doing business. Ginsberg v. Commissioner,supra;Payton v. United States,425 F.2d 1324 (5th Cir. 1970), cert. denied 400 U.S. 957 (1970); Ketter v. Commissioner,70 T.C. at 649-650. Sec. 1.704-1(e)(2)(vii)(a), Income Tax Regs. Compare Finlen v. Healy,187 F.Supp. 434, 436 (D. Mont. 1960); Smith v. Commissioner,32 T.C. 1261, 1269-1270 (1959), where such disclosures occurred. Indeed, the evidence in the record indicates that petitioner retained actual dominion and control over the coal business and that he negotiated with customers and creditors in his individual capacity. *289 Where, in the eyes of the public, an entity neither looks nor acts, nor ostensibly purports to be separate from another, it is persuasive evidence that it is but an alter ego of another created to gain the potential tax savings available through the use of multiple entities. Ketter v. Commissioner,supra.[19] In sum, we hold that LHR and the LHR Trust were nothing more than paper entities that will not be recognized for Federal tax purposes.
We reach a similar result with respect to the Kelly Trust. *290 It is a well settled maxim of tax law that when the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. See, e.g., Zmuda v. Commissioner,79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Professional Services v. Commissioner,79 T.C. 888 (1982). See also United States v. Buttorff,761 F.2d 1056 (5th Cir. 1985). This rule applies regardless of whether the entity has a separate existence recognized under state law ( Furman v. Commissioner,45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967)), and whether it takes the form of a trust, a common law business trust, or some other legal entity. Zmuda v. Commissioner,supra.[20]
In the instant matter, under the terms of the Kelly Trust, James Kelly acquired title to various mineral *291 rights from petitioner and Mrs. Reynolds. Mr. Kelly held the rights in trust "for the sole use and benefit of [petitioner and Mrs. Reynolds] as tenants by the entireties." The trust directed Mr. Kelly as trustee to promptly remit to petitioner and Mrs. Reynolds, the beneficiaries, any income attributable to the mineral rights as well as any proceeds from the sale of the rights. Mr. Kelly could not sell the mineral rights without written permission of petitioner and Mrs. Reynolds and could be replaced by them merely by being given 10 days' notice. Petitioner and Mrs. Reynolds were also required to pay all expenses relating to the mineral rights. Hence, it is apparent that Mr. Kelly's duties under the terms of the trust were minimal and that, in substance, petitioner retained control over the mineral rights. The reality of the transfer of the mineral rights to the trust was an attempt by petitioner to assign a portion of the proceeds from the sale of the mineral rights -- properties he fully controlled -- to Mrs. Reynolds. It is a well established rule that income is taxed to the person who earned it, *292 Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949), regardless of any anticipatory arrangements and contracts designed to prevent the income from vesting in the person who earned it. Lucas v. Earl,281 U.S. 111, 115 (1930). Determination of the proper taxpayer depends upon which person or entity controls the earning of the income rather than who received the income. United States v. Buttorff,supra at 1060-1061; Vnuk v. Commissioner,621 F.2d 1318, 1320 (8th Cir. 1980); Vercio v. Commissioner,73 T.C. 1246, 1253 (1980). See also Markosian v. Commissioner,73 T.C. 1235 (1980). As was explained more fully supra, petitioner retained substantial dominion and control over his coal business. Without being unnecessarily repetitive it is clear that the control he exerted over the mineral rights was no different than the control exercised over the mineral leases discussed above. It is also significant that petitioner has not offered any evidence that the Kelly Trust ever operated as an independent entity or that Mrs. Reynolds was at all involved in the decision making process. *293 Instead, the record clearly indicates that it was petitioner who proved up the coal lands associated with the mineral rights and arranged for the sale. In sum, when the economic realities of LHR, and the LHR and Kelly Trusts, are unmasked we are left with a taxpayer who completely directed and controlled his coal business such that the entire gain on the Gold Fields Transaction was taxable to him. [21]
*294 Turning to the amount of the capital gain, a review of the Distribution and Settlement Agreement persuades us that respondent has proven that petitioner should have reported an additional $3,071,545.50 (i.e., Mrs. Reynolds' share) [22] as gross receipts from the Gold Fields Transaction on his 1977 income tax return. The $3,071,545.50 figure appears in the above-mentioned agreement (after certain adjustments not relevant here) and the actual amount of the distribution is not contested by petitioner. [23]
*295 To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. By amended answer filed July 31, 1986, respondent increased the deficiency for the tax year ended December 31, 1977 to $808,524.33.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
3. At various times after this case was submitted, the Court has permitted the parties by way of motion to amend the stipulation and exhibits. The final record consists of paragraphs 1 through 27 (with the exception of the last sentence of paragraph 7, which was deleted) of the Stipulation of Facts filed June 19, 1986, and joint exhibits 1-A through 61-BI.↩
4. The record does not indicate the exact date the business was purchased. ↩
5. The record does not reveal the date the coal lands were sold.↩
6. Funding of LHR was to be as follows: The LHR partnership agreement called for capital contributions of $100 by Ms. Johnston and $900 by Mrs. Reynolds. The LHR Trust agreement indicates that 60 percent of the funds contributed to the partnership by Mrs. Reynolds were to be contributed by, and on behalf of, petitioner in his capacity as beneficiary of the LHR Trust. The record does not reveal, however, whether these amounts were actually paid. Funding of the LHR Trust was not disclosed in the record.↩
7. The parties stipulated that on her 1977 return Mrs. Reynolds reported "at least $3,222,447 of gross proceeds from the Gold Fields Transaction." No explanation was offered for the discrepancy between this amount and $3,071,545.50, the amount that was to be distributed to her (after certain adjustments not relevant here) under the Distribution and Settlement Agreement. Respondent's deficiency, as amended, was based on the $3,071,545.50 figure. Moreover, a memorandum prepared after the sale indicates that Mrs. Reynolds actually received $2,571,545.50 from the sale -- the $3,071.545.50 figure reduced by a $500,000 loan from Mrs. Reynolds to petitioner.↩
8. These amounts total less than the $3,071,545.50 plus $397,553.00 that were to be paid to Mrs. Reynolds and Ms. Johnston in 1977 under the Distribution and Settlement Agreement for reasons not disclosed in the record.↩
9. The Atlanta proceedings and a Chapter 11 proceeding that had been filed by Mrs. Reynolds on behalf of Lucky Management, her alter ego corporation, were transferred to and consolidated with the proceedings in the United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division, by order dated August 14, 1981.↩
10. The only adjustment that was not settled by the parties was Mrs. Reynolds' contention that $300,000 of the proceeds Mrs. Reynolds received from the Gold Fields Transaction represented a repayment to her in 1977 of a loan to petitioner.↩
11. Mrs. Reynolds also agreed to include in income the $300,000 she had originally claimed to be a loan. See note 10, supra.↩
12. On his 1984 individual income tax return, petitioner reported the $150,991.24 paid to him in 1984 in settlement of the lawsuit against Mrs. Reynolds. Petitioner maintained the same position with respect to his tax liability for that amount as he stated in the explanation on his 1983 return with respect to reporting the $857,900 received under the settlement with Mrs. Reynolds.↩
13. On July 29, 1986, respondent filed a motion for leave to amend his answer and lodged the amended answer with the Court. By Order dated July 31, 1986, respondent's motion was granted and the amended answer was filed on that same date.↩
14. Sec. 704(e)(1) provides: SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. (e) Family Partnership. -- (1) Recognition of Interest Created by Purchase or Gift. -- A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.↩
15. See also Goldfine v. Commissioner,80 T.C. 843, 857-858 (1983) (doctrine of economic substance applies independently of sec. 704(b)); Holladay v. Commissioner,72 T.C. 571, 586-588 (1979), affd. 649 F.2d 1176↩ (5th Cir. 1981) (same).
16. We are confirmed in approaching the issue in this manner by the legislative history of sec. 704(e). As was explained by the United States Court of Appeals for the Sixth Circuit in Krause v. Commissioner,497 F.2d 1109, 1111 (6th Cir. 1974), affg. 57 T.C. 890 (1972), cert. denied 419 U.S. 1108 (1975): Section 704(e) of the Code provides, in effect, that a person may be recognized as a partner for income tax purposes "if he owns a capital interest in a partnership in which capital is a material income-producing factor." (Emphasis added.) That section was enacted to prevent taxpayers from using the family partnership as a means of splitting family income and thus circumventing the progressive tax rate structure of the federal income tax. The legislative history of the section shows that Congress wanted the Commissioner and the courts to inquire into the question of whether the donee or the purchaser actually owns the purportedly transferred interest; and, in cases where the transferor retained incidents of ownership, it was the Congressional intent that he be taxable on the partnership's income. H. Rept. No. 586, 82d Cong., 1st Sess., p. 33; S. Rep. No. 781, 82d Cong., 1st Sess., pp. 39-40; 2 U.S. Code Cong. & Admin. News, pp. 1781, 1813-1815 & 1969, 2008-2010. Further, the Commissioner specifically implemented this Congressional purpose in Treas. Reg. § 1.-704-1(e)(1)(iii). This court recognized the Congressional purpose in Ballou v. United States,370 F.2d 659, 661-661 (1966). [Emphasis added.] Additionally, the Senate and House Reports discussing sec. 704's predecessor, focused on whether a "partner" is the "real owner" of the partnership interest and stated that "The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham." S. Rept. No. 781, 82d Cong., 1st Sess. 39 (1951), 1951-2 C.B. 458, 486; H. Rept. No. 586, 82d Cong., 1st Sess. 33 (1951), 1951-2 C.B. 357, 381. See also Ginsberg v. Commissioner,502 F.2d 965, 966 (6th Cir. 1974), affg. a Memorandum Opinion of this Court; Spiesman v. Commissioner,260 F.2d 940, 947-948 (9th Cir. 1958), affg. 28 T.C. 567 (1957); Cirelli v. Commissioner,82 T.C. 335, 343↩ n. 20 (1984).
17. In fact, as the trial court indicated in the divorce action, Mrs. Reynolds was actually a "hinderance" when it came to petitioner's business dealings.↩
18. See sec. 1.704-1(e)(2)(vii), Income Tax Regs., which provides: (vii) Trustees as partners. A trustee may be recognized as a partner for income tax purposes under the principles relating to family partnerships generally as applied to the particular facts of the trust-partnership arrangement. A trustee who is unrelated to and independent of the grantor, and who participates as a partner and receives distribution of the income distributable to the trust, will ordinarily be recognized as the legal owner of the partnership interest which he holds in trust unless the grantor has retained controls inconsistent with such ownership. However, if the grantor is the trustee, or if the trustee is amenable to the will of the grantor, the provisions of the trust instrument (particularly as to whether the trustee is subject to the responsibilities of a fiduciary), the provisions of the partnership agreement, and the conduct of the parties must all be taken into account in determining whether the trustee in a fiduciary capacity has become the real owner of the partnership interest. Where the grantor (or person amenable to his will) is the trustee, the trust may be recognized as partner only if the grantor (or such other person) in his participation in the affairs of the partnership actively represents and protects the interests of the beneficiaries in accordance with the obligations of a fiduciary and does not subordinate such interests to the interests of the grantor. Furthermore, if the grantor (or person amenable to his will) is the trustee, the following factors will be given particular consideration: (a) Whether the trust is recognized as a partner in business dealings with customers and creditors, and (b) Whether, if any amount of the partnership income is not properly retained for the reasonable needs of the business the trust's share of such amount is distributed to the trust annually and paid to the beneficiaries or reinvested with regard solely to the interests of the beneficiaries.↩
19. It is irrelevant that petitioner exercised control indirectly through another entity: Controls inconsistent with ownership by the donee may be exercised indirectly as well as directly, for example, through a separate business organization, estate, trust, individual, or other partnership. Where such indirect controls exist, the reality of the donee's interest will be determined as if such controls were exercisable directly. [Sec. 1.704-1(e)(2)(iii), Income Tax Regs.; see Ketter v. Commissioner,70 T.C. 637, 649 n. 10 (1978), affd. without published opinion 605 F.2d 1209↩ (8th Cir. 1979).]
20. It is therefore unnecessary to decide whether the Kelly Trust would have been recognized under state law. See Sampson v. Commissioner,81 T.C. 614, 618↩ (1983).
21. In light of our holding, it is apparent that the claim of right doctrine does not apply to the facts of this case. Petitioner apparently believes that it was proper for Mrs. Reynolds to report a gain on the Gold Fields Transaction under a claim of right. Resolution of that issue, however, does not affect the outcome of the proceedings before us. See and compare Donohue v. Commissioner,323 F.2d 651 (7th Cir. 1963), cert. denied 376 U.S. 937 (1964); Rossi v. Commissioner,41 B.T.A. 734 (1940). The only issue before us was whether it was proper for petitioner to report the entire gain. The claim of right doctrine simply has no application. The unrestricted right to the income in this case was vested with petitioner, and as our analysis reveals, his attempts to assign this income to others are not to be respected for tax purposes. Petitioner, alone, was the proper taxpayer to report the gain from the Gold Fields Transaction. Moreover, whether petitioner subsequently reported some of the gain on his 1983 or 1984 returns is irrelevant to the issue of whether the gain was required to be reported in 1977. The 1983 and 1984 tax years are not before us. See sec. 6214(b); Dial v. Commissioner,24 T.C. 117, 125↩ (1955). (In this regard, we express no opinion as to whether the mitigation provisions of secs. 1311-1314 might apply in these later years as a result of our Opinion.) Similarly, whether Mrs. Reynolds has paid tax on part of the gain is irrelevant to the issue of whether the entire gain was properly reportable by petitioner. While we sympathize with petitioner in that respondent may have recovered a portion of the taxes owed on the sale from Mrs. Reynolds, we nevertheless note that she is not a party to this action -- the sole focus of our inquiry is petitioner.
22. Technically, as we have found that it was proper for petitioner to report the entire gain on the Gold Fields Transaction, it follows that he should apparently have also reported Ms. Johnston's share of the proceeds. Respondent has not, however, amended his answer to assert that petitioner must report that amount, apparently because Ms. Johnston paid income taxes on her share of the gain. ↩
23. As we indicated supra↩ at note 7, there is a discrepancy between the amount of gain stipulated to have been reported by Mrs. Reynolds ($3,222,447) and the amount required to be distributed and actually distributed under the Distribution and Settlement Agreement ($3,071,545.50). Respondent's amended deficiency was based on the later figure and as he has not sought to further increase the deficiency based on the stipulated figure, we conclude that the $3,071,545.50 figure is the amount of additional proceeds properly taxable to petitioner.